**SOUTHTOWN PROPERTIES, INC., Meredith Suites, LLC, B.V. Belk, Jr., Eastgate Mall, LLC (as Successor in Interest to B.V. Belk, Jr), Appellants–Defendants,**

v.

**CITY OF FORT WAYNE on behalf of the DEPARTMENT OF REDE-VELOPMENT, Appellee–Plaintiff,**

**Auditor of Allen County, Indiana and Treasurer of Allen County, Indiana, Appellee–Defendants.**

No. 02A05–0410–CV–551.

Court of Appeals of Indiana.

Jan. 13, 2006.

Stephen L. Fink, Matthew M. Hohman, Jason T. Clagg, Barnes & Thornburg LLP, Fort Wayne, for Appellants.

Cathleen M. Shrader, Michael H. Michmerhuizen, Barrett & McNagny LLP, Fort Wayne, for Appellee City of Fort Wayne.

Joshua A. Burkhardt, Beers Mallers Backs & Salin, LLP, Fort Wayne, for Appellees Auditor and Treasurer of Allen County, Indiana.

## OPINION

VAIDIK, Judge.

### Case Summary

Southtown Properties, Inc., Meredith Suites, LLC, and B.V. Belk, Jr. and his successor in interest Eastgate Mall, LLC (collectively, the "Appellants") appeal from the judgment entered after a jury trial held to determine just compensation for property which the City of Fort Wayne ("City") took via eminent domain. Specifically, Appellants assert that the trial court abused its discretion by excluding certain evidence from the jury's consideration. Appellants also appeal the trial court's pre-trial grant of Allen County's Verified Request for Payment of 2004 taxes on the property. This case presents two questions of first impression in Indiana: first, whether the value of incentives offered to potential purchasers of property by a condemning authority before a condemnation action is filed is included in the fair market value of the property on the date of condemnation, and second, when the owner of condemned property loses title to that property for purposes of Indiana's tax statutes.

Finding that the trial court properly excluded evidence of the incentives, we affirm the amount of compensation determined by the jury. Furthermore, because the City's title to the property in question, for purposes of taxation, relates back to the date of the filing of the condemnation action, October 30, 2003, the Appellants did not hold legal title in fee to the property on March 1, 2004, the assessment date

for 2004 property taxes, and we reverse the order for payment and remand to the trial court with instructions to order that Appellants be reimbursed for 2004 property taxes.

### Facts and Procedural History

In 1998, Southtown Properties, Inc. ("Southtown Properties") purchased the 102–acre Southtown Mall site ("Property") in Fort Wayne, Indiana, for $3,250,000.00. At the time, the Property was in a state of disrepair, and two of the anchor tenants had made the decision to vacate their leases. Southtown Properties retained part of the Property and sold other portions to B.V. Belk, Jr. and his successor in interest Eastgate Mall, LLC ("Belk"), Meredith Suites, LLC ("Meredith Suites"), and Kennith Whichard ("Whichard") (together, along with Southtown Properties, the "Owners").[1] While the Owners owned the Property, only "necessary maintenance" was performed. Tr. p. 462.

In the spring of 2000, the City formed a task force to study the condition of the Property, to explore options for the revitalization of the area, and to locate a purchaser. In an effort to attract a purchaser who would develop the Property, the City offered certain incentives. Specifically, the City advertised certain potential tax benefits and offered to pay for new ingress and egress to the Property, a new entrance to the Property, all costs of environmental remediation, and all costs of demolishing a building on the Property.[2] It was an "accepted fact" that these incentives were available to any party willing to purchase and develop the Property. Appellant's App. p. 83. One member of the task force, developer Barry Sturges ("Sturges"), began looking for potential developers for the Property. Eventually, Sturges himself became interested in becoming the developer.

On June 24, 2000, Sturges, through his company Sturges, LLC, entered a Real Estate Purchase and Sale Agreement ("Sturges LLC Agreement") for the purchase of part of the Property for $4,500,000.00. That agreement was later amended to include all of the Property and to increase the purchase price to $5,050,000.00. Eventually, Sturges, LLC assigned its rights and obligations under the agreement to Grand/Sakwa Acquisitions, LLC ("Grand/Sakwa"). However, on July 13, 2001, Grand/Sakwa sent a letter to the owners informing them that it had decided not to purchase the Property.

On December 18, 2002, Southtown Centre, LLC ("Southtown Centre"), another Sturges-owned entity, and Menard, Inc. entered a Purchase and Sale Agreement ("Menard Agreement"), in which Menard agreed to purchase a portion of the Property from Southtown Centre "once [Southtown Centre] acquired it." Appellant's Br. p. 8. Southtown Centre never acquired the Property, so the Menard Agreement never closed.

---

1. We pause to emphasize the distinction between the "Appellants" and the "Owners." The "Appellants" are Southtown Properties, Belk, and Meredith Suites. The "Owners" are Southtown Properties, Belk, Meredith Suites, *and* Whichard. Whichard, whose portion of the Property was also taken by the City, does not appeal the judgment, and therefore is not included in the "Appellants." Whichard is, however, a nominal party to the appeal. Ind. Appellate Rule 17(A).

2. The Southtown Owners contend that the total value of the incentives offered by the City is $8,000,000.00–$11,000,000.00. The City does not say how much the incentives were worth. For purposes of this opinion, we find it unnecessary to attempt to determine the exact value; it is sufficient to say that the incentives were worth millions of dollars.

Sometime in early 2003, JTL Capital, LLC signed an Earnest Money Contract ("JTL Agreement") to purchase the Property for $6,000,000.00. Southtown Properties asked the City to provide the incentives to JTL, but the City responded that the JTL Agreement contained too many contingencies. The JTL Agreement never closed.

Finally, on September 4, 2003, one of the existing Owners, Belk, entered a Purchase Agreement for Commercial–Industrial Real Estate ("Belk Agreement") in which Belk agreed to purchase the portion of the Property that he did not already own for $6,000,000.00. However, the Belk Agreement expressly stated that it was a "back up offer" in the event that the JTL Agreement did not close. Appellant's App. p. 349. The Belk Agreement never closed.

On February 1, 2003, the Property having not been sold, Southtown Properties told the remaining mall tenants that their leases would not be renewed and that the mall would be closing. On October 30, 2003, the City condemned the Property by filing a Complaint for Appropriation of Real Estate Interests. The Auditor and Treasurer of Allen County ("County") were named as parties in the litigation because of their tax liens on the Property. The trial court appointed Lowell Griffin, Daniel Kruse, and Verne Mitchell III to appraise the value of the Property. In a report filed on February 27, 2004, the court-appointed appraisers determined the condemnation value of the Property to be $3,440,001.00. On March 5, 2004, the City tendered this amount to the Clerk of the

Allen Circuit Court and took possession of the Property. On March 18, 2004, the Owners filed their "Exceptions to Appraisers' Report and Jury Demand," claiming that the amount determined by the appraisers and tendered by the City was too low and did not constitute just compensation.[3]

On April 26, 2004, the County filed a Verified Request for Payment, seeking $241,804.87 of the funds deposited with the trial court as payment for delinquent 2002 taxes and estimated 2003 and 2004 taxes on the Property. The Owners filed their objection to the County's request, which was followed by a response from the County. The trial court heard arguments from the parties on the tax issue during two hearings held on June 15 and September 1, 2004. On September 2, 2004, the trial court granted the County's request for payment and ruled that the County's participation in the condemnation proceeding was no longer required. Thereafter, the County withdrew $241,804.87 from the amount on deposit with the trial court, including $113,321.09 for estimated 2004 taxes payable in 2005.

The trial to determine damages was held from September 13–16, 2004. Sturges, who at the time had the Property listed for sale for $8,600,000.00, testified that the bare land value of the Property on October 30, 2003, was $1,500,000.00–$2,000,000.00. Court-appointed appraisers Lowell Griffin, Will Stump, and Larry Misner, having determined that the highest and best use of the Property was as vacant land, reported a final average appraisal value of $3,060,895.91.[4] The Owners testified that

---

**3.** In addition to the Owners, other parties held various interests in the Property, including Roy E. Mashburn, Madhusudan Modi, Kusum Modi, Bridgestone/Firestone, Inc., Interbay Funding, LLC, USA Billiards, Inc. All of these parties were named as defendants in the City's condemnation action and apparently

joined in the filing of the exceptions to the appraisers' report. In any case, none of these parties have joined in this appeal, so further discussion of their involvement in the case is unnecessary. *But see supra* note 1.

**4.** The appraisers first determined that the Property would be most valuable as vacant

the value of the Property was between $8,000,000.00 and $9,000.000.00. Furthermore, the Owners sought to introduce evidence of: (1) the incentives offered by the City to potential developers; (2) various purchase agreements relating to the Property; and (3) the price Sturges agreed to pay for the Property before condemnation and the price for which Sturges, as a real estate broker, listed the Property after condemnation. The trial court ruled all such evidence inadmissible.[5] The jury determined just compensation to be $4,509,000.00, which the City "subsequently" tendered. County's Br. p. 20.[6] All of the Owners except Whichard, i.e., the Appellants, now appeal.

### Discussion and Decision

The Appellants raise two basic arguments on appeal. First, they argue that the trial court abused its discretion by excluding certain evidence from the trial on damages. Second, they assert that the trial court erred by allowing the County to withdraw funds from the court in order to pay for 2004 taxes on the Property. Each of these arguments is explored in more detail below.

### I. Admissibility of Evidence

The Appellants first contend that the trial court abused its discretion by excluding from the jury's consideration the following classes of evidence, which they argue would have increased the jury's de-

termination of the fair market value of the Property: (1) evidence of the incentives offered by the City to prospective developers; (2) evidence of the purchase agreements relating to the Property; and (3) evidence showing alleged inconsistencies in Sturges' valuation of the Property.

"As a general matter, the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal." *Carpenter v. State*, 786 N.E.2d 696, 702 (Ind.2003). A trial court's decision to exclude evidence constitutes an abuse of discretion if it is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.* at 703. We review the admissibility of each class of evidence in turn.

### A. Incentives

■ The Appellants argue that the trial court abused its discretion by refusing to allow evidence of the incentives offered by the City to potential developers, including new ingress and egress to the Property, a new entrance to the Property, all costs of environmental remediation, all costs of demolishing a building on the Property, and certain tax benefits, because the incentives "undoubtedly added value to the Property." Appellant's Br. p. 13. The City responds that the trial court properly excluded evidence of the incentives because the

---

land. Because buildings would have to be demolished and environmental remediation would have to be done in order to turn the Property into vacant land, the appraisers subtracted those costs to arrive at the final condemnation value. In other words, the value of the Property with the buildings in place, according to the appraisers, was $3,060.895.91.

5. The trial court based its exclusion of evidence of the incentives and purchase agreements on its pre-trial rulings made in response to several motions in limine filed by the City during the months leading up to the

trial. As to the evidence relating to Sturges' listing price for the Property, we note that the Owners' attorney actually stated in front of the jury, in the form of a question, the price at which Sturges had listed the Property after condemnation. The trial court denied the City's subsequent motion for mistrial but admonished the jury to disregard the attorney's mention of the listing price.

6. The date on which the County tendered compensation and the exact amount tendered is unclear from the record.

incentives were "part of the project for which the property was taken." Appellee City's Br. p. 22, 29. We agree with the City.

 "It is well established in Indiana that the basic measure of damages in eminent domain cases is the fair market value of the property at the time of the take." *State v. Bishop*, 800 N.E.2d 918, 923 (Ind. 2003), *reh'g denied.* "Fair market value is the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale." *Id.* "Anything affecting the sale value on·the date of the taking is a proper matter for the jury's consideration in attempting to arrive at a 'fair market value.'" *Id.* Generally, "all facts which an ordinarily prudent man would take into account before forming a judgment as to the market value of property he contemplates purchasing [are] relevant and material." *Gradison v. State*, 260 Ind. 688, 692, 300 N.E.2d 67, 72 (1973) (quoting *Clark v. United States*, 155 F.2d 157 (8th Cir.1946)).

Not *all* facts, however, are relevant to the fair market value of property. In *State v. Sovich*, 253 Ind. 224, 252 N.E.2d 582 (1969), an expert witness testified that his estimate of the value of a piece of property was partially based on the fact that changes that would be brought about by the highway project for which the property was being taken, including changes in traffic patterns, would impair the value of the property. The trial court granted the property owner's motion to strike this testimony from the record, and the State appealed.

On appeal, the State's essential contention was that the trier of fact, in determining the value of the property being condemned, could properly consider the decrease in market value occasioned by the project for which the property was being taken because the decrease affected the sale value at the time of the taking. In affirming the trial court's exclusion of the evidence, our Supreme Court held:

> It is difficult to imagine a more specious argument. If [the State's] argument were adopted by this Court it would be a simple matter for any condemnor to depress property values merely by publishing details of the planned project. Although this Court has never addressed itself to this precise issue, it is clear that the weight of authority holds that neither an increase nor a decrease in the market value of the property sought to be taken, which is brought about by the same project for which the property is being taken, may be considered in determining the value of the property.

*Id.* at 233–34, 252 N.E.2d at 588.

We believe that the rule announced in *Sovich* is essentially a rule of the relevancy of evidence. Since *Sovich*, Indiana has adopted the Indiana Rules of Evidence, and today, the relevancy of evidence is generally governed by Rules 401–403. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. "Evidence which is not relevant is not admissible." Ind. Evidence Rule 402. *Sovich* basically stands for the proposition that evidence of changes in the value of property brought about by the project for which the property is being taken is irrelevant to the determination of the value of the property on the date of condemnation, i.e., the date the condemnation action is filed.

In this case, the "project" for which the Property is being taken is the revitaliza-

tion of the entire Southtown area, and the incentives offered by the City are part of that project. The Appellants contend that they should have been allowed to present evidence of the incentives because they increased the potential sale value of the Property at the time of the taking. Because this argument is essentially the same as that made by the State in *Sovich*, we reject it.

 As a practical matter, we do not deny that the City's offer of incentives inflated the potential sale value of the Property. However, under *Sovich*, any increase in the potential *sale* value of the Property brought about by the incentives is irrelevant to the determination of the *condemnation* value of the Property.[7] In other words, if the Property had been sold before the City condemned it, the purchase price would have reflected the existence of any incentives. In such a situation, the Appellants would have been incidental beneficiaries of the City's incentive plan.[8] But once the City filed the condemnation action, the value of the incentives previously offered became irrelevant to the fair market value of the Property. All that is being taken from the Appellants is a parcel of land occupied by several deteriorating buildings. The incentives offered by the City are not being "taken" from the Appellants, so they had no right to be compensated for the value of the incentives. Indeed, the Appellants are in the same position now as they would have been had the City filed the condemnation action in 2000 without ever offering incentives to private developers. Therefore, the trial court did not abuse its discretion by excluding evidence of the incentives.[9]

7. In their briefs, the parties go to great lengths to distinguish between *Sovich*'s "project rule" and the so-called "intended specific use rule." The "intended specific use rule," as generally stated, prohibits evidence of the intended specific future use of property to show the market value of the property as of the date of the taking. *See* 11A I.L.E. Eminent Domain § 57 (1998). The parties debate whether the rule is limited to an owner/condemnee's intended future use or if it also applies to exclude evidence of a condemnor's intended future use. Because we find *Sovich*'s project rule to be controlling, any distinction between the rules is irrelevant in this case. That being said, it appears that any distinction between the rules is largely semantic, and at least one Indiana case seems to have recognized as much. *See City of Indianapolis v. Heeter*, 171 Ind.App. 119, 137, 355 N.E.2d 429, 440 (1976) (citing *Sovich*'s "project" language but holding, "As a general rule, the *intended future use* that is to be made of condemned property *by the condemnor* is not to be considered in determining fair market value.") (emphases added).

8. For example, if the value of the Property standing alone is $4,500,000.00, and any buyer would have also received $4,500,000.00 in incentives from the City after making the purchase, a private purchaser may very well have paid more than $4,500,000.00 to the Owners, whereas the Owners would have only received $4,500,000.00 in the absence of any incentives.

9. Here, the trial court's decision to exclude evidence of the incentives from the determination of the fair market value of the condemned property was based on a legal analysis, i.e., the court's interpretation of the rule announced in *Sovich*. Arguably, when a trial court's decision to admit or exclude evidence turns on a legal conclusion, we should review it *de novo* rather than for an abuse of discretion. *See Stahl v. State*, 686 N.E.2d 89, 91 (Ind.1997) ("[T]he ultimate question in this case is the interpretation of the language of a rule of evidence that presents a question of law for this Court."); *cf. Evans v. State*, 727 N.E.2d 1072, 1081 (Ind.2000) (when reviewing a trial court's decision to give or reject a lesser included offense jury instruction, we apply a *de novo* standard of review if the trial court's decision resulted from a legal analysis). However, the general practice of this Court and the Indiana Supreme Court is to review *all* admissibility determinations for an abuse of discretion. Therefore, until our Supreme Court directs us otherwise, we will

Our conclusion is buttressed by strong public policy concerns. First, the City contends, correctly we believe, that the aim of *Sovich*'s "project rule" is not only to prevent a *condemnor* from depressing the value of property by publicizing a value-impairing project, but also to prevent a *condemnee* from receiving a windfall of excessive compensation by presenting evidence of increases in property's value brought about by the project for which the property is being taken.

Second, incentive plans like that devised by the City in this case are a positive step toward the revitalization and development of blighted areas. If evidence of the incentives were admitted and the City were forced to include the value of the incentives in its compensation of the Appellants, the City would be placed in a difficult position. That is, it would either have to pay for the incentives a second time in its continuing effort to have the Property developed or face the possibility that the Property will not be developed because it is no longer financially able to offer the incentives. When faced with these two possibilities, a condemning authority is likely to forego all together the offering of development incentives to private buyers and to proceed directly to a condemnation action. We should, for the good of Indiana's cities and towns, encourage entities with the power to condemn property to create public-private partnerships through the offering of incentives to potential private developers. On a related note,

we presume that owners of private property, including the Appellants, would welcome the opportunity to sell their property on the private market before having to go to court to battle with the government over the issue of just compensation.

### B. Purchase Agreements

■ The Appellants also contend that the trial court erred by excluding evidence of agreements for the purchase of the Property, including the Sturges LLC Agreement (later assigned to Grand/Sakwa), the JTL Agreement, the Belk Agreement, and the Menard Agreement. The Appellants argue that the agreements were "fully executed and legally binding contracts" which tend to prove the fair market value of the Property.[10] The City responds that the agreements did not constitute contracts, but were simply "unconsummated offers" to purchase the property, and therefore were too speculative to be relied upon in determining the fair market value of the Property. We agree with the City that the trial court properly excluded evidence of the agreements, but for a different reason. Specifically, because all of the agreements were based on the City's offer of incentives, and because the incentives are irrelevant to the determination of the condemnation value of the Property, evidence of the agreements is inadmissible under the Indiana Rules of Evidence.

As the Appellants point out in their brief:

---

continue to do so. We note that even if we were to review *de novo* the trial court's decision to exclude evidence of the incentives, our result would not change.

10. This is an interesting argument. If each of the agreements concerns the sale of the same property, and each of the agreements is fully executed and legally binding, it would appear that the Appellants have obligated themselves to transfer the same piece of property to mul-

tiple buyers. Likewise, if the agreements were in fact fully executed and legally binding, it seems that the Appellants would have no interest in the outcome of the current litigation, but rather only in enforcing the terms of the agreements. These pragmatic considerations undermine the Appellants' argument that each of the agreements is fully executed and legally binding.

Throughout 2000 and 2001, the City offered various incentives to Grand Sakwa to encourage its purchase and development of the Property, including paying for new ingress and egress to the Property; a new entrance to the Property; all costs of environmental remediation; and all costs of demolishing the building on the Property (the "Incentives"). The total value of the incentives was between $8,000,000 and $11,000,000. *The City, through Mayor Graham Richard, committed to providing the incentives to any developer willing to purchase the Property irrespective of whether condemnation was ever pursued. The City considered its provision of incentives to encourage commercial redevelopment of the Property to be "always an accepted fact."*

Appellant's Brief p. 7 (emphasis added). The Sturges LLC (Grand/Sakwa), JTL, and Belk Agreements were all entered into with knowledge of, or were contingent upon, the City's offer of incentives.[11] As such, the price terms included in the agreements were undeniably impacted by the existence of the incentives.

Indiana Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Because the price terms included in the agreements were based in part on the value of the Property standing alone, the agreements have some relevance to the determination of the fair market value of the Property. However, the price terms were also based in part on the City's offer of incentives, and because the value of the incentives is irrelevant to the value of the Property, the probative value of the purchase agreements is substantially outweighed by the danger of unfair prejudice to the City. In practical terms, admitting the agreements into evidence would have allowed the jury to consider the incentives indirectly, something it could not do directly. Therefore, the trial court did not abuse its discretion by excluding evidence of the agreements.

In a related argument, the Appellants contend that they should have been allowed to introduce the purchase agreements into evidence because the City "opened the door" by pointing out that little maintenance had been done on the Property and no new tenants had been found, thereby impairing the market value of the Property. Appellant's Br. p. 25. The Appellants assert that the reason that little maintenance was done and no tenants were found is because the potential buyers of the Property had requested that no major changes be made. According to the Appellants, if the jury knew about the agreements, it would have understood why the Property was in a state of disrepair. First, we agree with the City that "[t]he reasons why there was limited maintenance performed or [sic] no additional tenants obtained is irrelevant—the fact that such conditions existed at the time of the taking had an effect on the value of the Property regardless of the [Appellants'] reasons for the same." City's Br. p. 41.

Second, as the City notes, even though the Appellants were not allowed to present evidence of the agreements, they were still able to explain the lack of repair and new tenants to the jury. Haywood Whichard, the principal of Southtown Properties, testified repeatedly that the reason no major

---

11. The Menard Agreement did not include a price term, and it was contingent upon Southtown Centre, LLC, a Sturges-owned entity, acquiring the Property, which never happened.

repairs had been done on the Property and no new tenants had been found is because of negotiations with potential buyers and because at least one of the potential buyers specifically asked that no major renovations be done and no new leases signed. Tr. p. 500–503. Finally, to the extent that the agreements are relevant to explaining the lack of repair and new tenants, the probative value of the agreements is far outweighed by the prejudice caused by the simultaneous introduction of the price terms contained in those agreements. *See* Ind. Evidence Rule 403.

### C. Impeachment

■ Next, the Appellants argue that the trial court abused its discretion by refusing to allow them to impeach Sturges. "The general rule regarding the admissibility of facts in connection with the impeachment of a witness' testimony is that any fact which tends to reflect upon the veracity of that testimony may be introduced to impeach the witness." *Fridono v. Chuman,* 747 N.E.2d 610, 620 n. 12 (Ind.Ct.App.2001), *trans. denied.* "In all cases, the party producing the witness may contradict the witness: (1) by other evidence; and (2) by showing that the witness has made statements different from the present testimony of the witness." Ind. Code § 34–45–4–1(c); *see also* Ind. Evidence Rule 607.

At trial, Sturges, an experienced real estate developer and broker, testified that the Property had a bare land value of $1,500,000.00–$2,000,000.00 on October 30, 2003. The Appellants sought to impeach Sturges with evidence that showed that Sturges' real estate company had a portion of the Property listed for $8,600,000.00 in September 2004 and that Sturges had agreed to buy the Property for $5,050,000.00 under the Sturges LLC Agreement. The Appellants argue that "Sturges' testimony was undeniably preju-

dicial to the [Appellants], and the [Appellants] were entitled to impeach it." Appellant's Br. p. 27.

■ The City responds that Sturges' testimony that the bare land value of the Property is $1,500,000.00–$2,000,000.00 is "clearly reconcilable" and not inconsistent with Sturges' listing of the Property for $8,600,000.00 and his earlier offer of $5,050,000.00 because the listing and the offer both took into consideration the value of the incentives to be provided by the City. We agree. Sturges' various statements simply reflect the fact that the Property is worth one amount standing alone and worth a very different amount when the value of the incentives is included. Furthermore, the reason that Sturges' in-court valuation is significantly lower than his out-of-court valuations is because the trial court properly excluded all evidence of the incentives from the trial. "If the two statements are consistent and reconcilable with each other, the statement made out of court will not be received to impeach the witness." *Dunlap v. State,* 761 N.E.2d 837, 843 n. 6 (Ind.2002) (quoting *Wagner v. State,* 116 Ind. 181, 184, 18 N.E. 833, 835 (1888)). And again, admitting the proffered impeachment evidence would have allowed the jury to indirectly consider the incentives, which we have said are irrelevant to determining the value of the Property. Because Sturges' in-court and out-of-court statements are consistent, the trial court did not abuse its discretion in refusing to allow the Appellants to impeach Sturges.

### II. 2004 Taxes

■ Next, the Appellants argue that the trial court erred by awarding the County $113,321.09 for 2004 property taxes, payable in 2005, because the County failed to present any evidence at trial of its entitlement to those taxes. Furthermore,

the Appellants contend that they should not be required to pay the 2004 taxes because the title taken by the City relates back to the date of the filing of the condemnation action, October 30, 2003, which was before the assessment date for 2004 taxes, March 1, 2004.

As a preliminary matter, the County notes that Whichard did not join in this appeal and argues that the Appellants do not have standing to appeal the tax judgment against Whichard. Whichard owned three of the six parcels that comprise the Property, and he was found by the trial court to be responsible for $82,536.22 of the $113,321.09 in 2004 property taxes on the Property. As the County notes:

> The judicial doctrine of standing focuses on whether the complaining party is the proper person to invoke the court's power. It is designed to assure that litigation will be actively and vigorously contested. The standing requirement is a limit on the court's jurisdiction which restrains the judiciary to resolving real controversies in which the complaining party has a demonstrable injury.

*Schloss v. City of Indianapolis,* 553 N.E.2d 1204, 1206 (Ind.1990), *reh'g denied.* Even assuming that the trial court erred in awarding 2004 taxes to the County, the Appellants have not shown that Whichard's tax liability in any way affects their own tax liability, so they have not demonstrated the injury required to have standing to challenge the tax judgment against Whichard. As such, we are only concerned with the $30,784.87 in 2004 taxes attributable to the Appellants.

### A. Judgment in Favor of the County Constituted Summary Judgment

 The Appellants first contend that the County should be required to return the money it withdrew from the clerk of court's office for 2004 taxes because the withdrawal "is not supported 'by the judgment of the court upon trial held on the exceptions to the assessment of damages by the appraisers.'" Appellant's Br. p. 28 (quoting Ind.Code § 32–24–1–11(d)(4)). Indiana Code § 32–24–1–11(d) allows a defendant in a condemnation action to file a written request for payment for that defendant's proportionate share of the damages held by the circuit court clerk.[12] The County made such a request, the trial court granted it, and the County withdrew $30,784.87 for the Appellants' estimated 2004 taxes. The Appellants argue that Indiana Code § 32–24–1–11(d) contemplates only a temporary withdrawal and that the County is only entitled to retain the amount determined by the jury, in this case, nothing.[13]

---

12. The County is a "defendant" entitled to request payment under the statute because it has a statutory tax lien on the Property that attaches on March 1 of each year.

13. In arguing that Indiana Code § 32–24–1–11 authorizes only a temporary withdrawal of funds by a defendant, the Appellants rely on the following language from that section:

> If exceptions to the appraisers' report have been duly filed by the plaintiff or any defendant, the circuit court clerk may not make payment to any defendant of any part of the damages deposited with the clerk by the plaintiff until the defendants requesting payment have filed with the circuit court clerk a written undertaking, with surety approved by the court, for the *repayment to the plaintiff* of all sums received by those defendants in excess of the amount or amounts awarded as damages to those defendants by the judgment of the court upon trial held on the exceptions to the assessment of damages by the appraisers.

Ind.Code § 32–24–1–11(d)(4) (emphasis added). As a textual matter, it appears that this section of the statute was written to protect the condemnor in the event that the jury verdict is lower than the appraisers' award. It is not meant to protect one defendant in the event that another defendant withdraws more from the initial deposit than her share of the

The trial court entered two orders on the tax issue, both captioned: "Order or Judgment of the Court." County's App. p. 0, 7. The thrust of each order was that the County was entitled to payment of estimated 2004 property taxes on the Property and that the County's participation in the trial was no longer required. The County argues that the trial court's orders constituted a grant of summary judgment in the County's favor, rather than simply an authorization for a temporary withdrawal of funds, as the Appellants contend. To support this assertion, the County argues that the tax issue was a pure question of law to be decided by the trial court; that is, who was the owner of the Property on March 1, 2004, the date of assessment for 2004 taxes?[14] We agree with the County. Indeed, the Appellants' attorney acknowledged that the tax issue was a question of law at a hearing held the day before the trial court issued its orders, stating:

> 2004 is going to be the only issue. I think [the County's attorney] is correct. We are very, we are pretty limited in what the issues will be. And then there will be a legal issue as to, does [sic] the [Appellants] have any responsibility for any taxes or are we responsible for all the taxes. That relates to the fact that the condemnation took place prior to March 1, but the City didn't pay into Court the money until after March 1. *I*

*think that becomes a legal issue that I think the Court will have to decide.*

County's App. p. 80–81 (emphasis added).

■■ Furthermore, we reject the Appellants' contention that the amount of the 2004 taxes presented a factual issue to be determined by the jury.

> What property shall be taxed, and how it shall be taxed, are legislative questions, so long as there is uniformity and equality of rate as to those of the same class; and the subjects and methods of taxation are legislative matters, and cannot be disturbed so long as the method prescribed is applicable alike to all within the prescribed class.

*Majestic Star Casino, LLC v. Blumenburg,* 817 N.E.2d 322, 326 (Ind. Tax Ct.2004) (quoting *Davis v. Sexton,* 210 Ind. 138, 157, 200 N.E. 233, 241 (Ind.1936)). We agree with the County that "the amount of the tax on a parcel for a given year is determined as a matter of law." County's Br. p. 16; *see also Lake County Prop. Tax Assessment Bd. of Appeals v. U.S. Steel Corp.,* 820 N.E.2d 1237, 1238 (Ind.2005), *reh'g denied.* Therefore, the trial court did not err in excusing the County's participation in the jury trial.[15]

■■■ Still, the Appellants argue that the trial court's orders could not have been for summary judgment because neither of the parties filed a motion for summary judgment. They contend that "the procedural safeguards of Rule 56 would lose

---

final verdict. *See Socony Mobil Oil Co. v. State,* 248 Ind. 680, 687, 230 N.E.2d 530, 534 (1967).

**14.** Indiana Code § 6–1.1–2–4(a) provides, in pertinent part: "The owner of any real property on the assessment date of a year is liable for the taxes imposed for that year on the property[.]"

**15.** We also note that in the event the County's 2004 assessment estimate is inaccurate, the trial court has ordered that "any funds re-

maining in trust for [the Appellants] with the Treasurer of Allen County, Indiana, after full payment of the ... 2004 Property Taxes on the [Property], shall be returned to the Court for redistribution to the proper party on or before July 15, 2005." County's App. p. 5. Furthermore, if the Appellants desire to challenge the 2004 assessment, we direct them to Indiana Code 6–1.1–15, entitled "Procedures for Review and Appeal of Assessment and Correction of Errors."

their force if any motion ... could be transformed into a motion for summary judgment without notice to the non-movant." Appellant's Reply Br. p. 3. We agree that before a trial court enters summary judgment, the parties must be afforded certain procedural safeguards. When, as in this case, a trial court enters an order in the nature of summary judgment, our main concern on appeal is "whether the party against whom summary judgment has been entered had notice and adequate opportunity to prepare and present materials in opposition." *Jones v. Berlove,* 490 N.E.2d 393, 395 (Ind. Ct.App.1986). In this case, the Appellants were given notice of the issue to be decided and an adequate opportunity to prepare and present materials on that issue.

The County filed its Verified Request for Payment on April 26, 2004. Over four months later, on September 26, 2004, the trial court granted that request and excused the County from participation in the trial. During the time between those two events, the Appellants filed an eight-page memorandum of law in objection to the County's request and were allowed to make arguments in support of their position at two separate hearings. We cannot agree that the Appellants were not afforded the procedural safeguards guaranteed under Indiana Trial Rule 56. The Appellants were well aware of the issue before the trial court and had an adequate opportunity to present their position. Therefore, to the extent that the County's request for payment was treated as a motion for summary judgment, the Appellants suffered no prejudice.

**B. Summary Judgment in Favor of the County on 2004 Taxes was Erroneous**

 Having found that the Appellants had adequate notice of the summary

judgment proceeding and an adequate opportunity to prepare and present the necessary materials, we now review the substance of that judgment. The trial court found that the Appellants are liable for 100% of the 2004 taxes on the Property because they held legal title in fee to the Property on March 1, 2004. Indiana Code § 6–1.1–2–4(a), provides, in pertinent part: "The owner of any real property on the assessment date of a year is liable for the taxes imposed for that year on the property[.]" The "owner" of real property for purposes of that section is the holder of the legal title in fee to the property, Ind. Code § 6–1.1–1–9(b), and the "assessment date" is March 1. Ind.Code § 6–1.1–1–2(1). In sum, the holder of the legal title in fee to real property on March 1 of each year is liable for the taxes imposed for that year on the property. Therefore, we must determine whether the trial court correctly found the Appellants to be holders of legal title in fee to the Property on March 1, 2004. Because the relevant facts are not in dispute, we are presented with a pure question of law. We review questions of law under a de novo standard and owe no deference to a trial court's legal conclusions. *Walters v. Grant County Council,* 821 N.E.2d 415, 417 (Ind.Ct.App.2005).

The trial court, as does the County on appeal, relied upon our Supreme Court's decision in *Lake.Erie & Western Railway Company v. Kinsey,* 87 Ind. 514, 1882 WL 6557 (1882). In *Kinsey,* a railroad company filed a condemnation action, paid the $50.00 awarded by the appraisers, and took possession of the land. After the landowner filed his exceptions to the appraisers' award, a jury trial was held and just compensation was determined to be $790.00. The railroad company refused to pay the higher amount, but also refused to vacate the land. The landowner filed suit for possession, and the trial court entered judgment in his favor. On appeal, the

railroad company argued that title passed on the day it paid the $50.00 appraisers award and that the landowners only remedy was to attempt to enforce the judgment for compensation, not to retake possession.

Our Supreme Court held:

The payment of the amount awarded by the appraisers gives the corporation a right to the immediate possession and a *prima facie* claim to the land subject to an appeal in ten days after the award is filed. If no appeal is taken, at the end of the ten days the title vests and relates back to the date of payment. If an appeal is taken no title vests, and the corporation has no greater right than that of a license under the statute to hold possession and proceed with the construction of its road pending litigation. When the compensation has been finally fixed on appeal, then the corporation must pay or tender the compensation so fixed, and on failure to do so it acquires no title to the land, and its license to hold possession and prosecute its work ceases. Just compensation must be first made or tendered. The verdict of the jury and the judgment of the court determine what that just compensation is.

\* \* \* \* \* \*

The amount found due on appeal must be paid or tendered before the title passes.[16]

*Kinsey*, 87 Ind. 514, 1882 WL 6557 at \*2–\*3.

The County argues that *Kinsey* stands for the proposition that in a condemnation case, when exceptions are filed and a trial is held on damages, title does not pass from the condemnee to the condemnor until the condemnor has paid just compensa-

tion as determined by the jury. The County also contends that even if that title, once vested, does relate back, it relates back only to the date of the payment of the appraisers' award, not to the date of the filing of the condemnation action. If we were to adopt the County's formulation, then in this case the Appellants would be liable for 2004 taxes on the Property because the City's title would relate back to March 5, 2004, the date it paid the appraisers' award and took possession of the Property, four days after the March 1st assessment date for 2004 taxes. We do not believe this conclusion is required by the holding in *Kinsey*, and we agree with the Appellants that, for tax purposes, the City's title to the Property should relate back to the date of the filing of the condemnation action.

We are persuaded by the analysis of the Illinois Supreme Court in *Chicago Park District v. Downey Coal Co.*, 1 Ill.2d 54, 115 N.E.2d 223 (1953), *reh'g denied.* In that case, the court was confronted with a statute and a factual scenario virtually identical to those in the instant case. The Chicago Park District ("District") filed a petition for condemnation on May 11, 1951, for land owned by Downey Coal Company ("Downey"). On May 16, 1952, the trial court entered a judgment order setting the condemnation award at $70,000.00, and the District deposited this amount with the county treasurer. On June 6, 1952, Downey filed a petition asking the trial court to order the county treasurer to pay Downey all or part of that award. In response, the trial ordered the county treasurer to disburse to Downey $66,500.00 and to retain $3500.00 as security for 1951 and 1952 property taxes "until further order of the court." *Id.* at 224. The property tax stat-

---

**16.** The word "appeal," as used in *Kinsey*, is equivalent to the filing of exceptions to an appraisers' report today. It should not be taken to mean an appeal to this Court or the Indiana Supreme Court.

ute in effect in Illinois at the time provided: "The owner of property on the first day of April in any year shall be liable for the taxes of that year." Ill.Rev.Stat.1951, chap. 120, par. 509.

On June 9, 1952, the county treasurer filed an answer to Downey's June 6th petition, contending that, by statute, the 1951 property taxes became a lien against Downey on April 1, 1951, and that the 1952 property taxes became a lien against Downey on April 1, 1952. The trial court agreed that the county treasurer could retain funds representing the 1951 property taxes, but it ordered that the amount withheld for the 1952 property taxes be paid out to Downey. The county treasurer appealed, arguing that legal title to the property did not pass to the District until it paid the condemnation award on May 16, 1952, and that therefore Downey still held legal title to the property on April 1, 1952, the date of assessment for 1952 property taxes.

In affirming the trial court, the Illinois Supreme Court first cited the general rule that "title to property which is the subject of condemnation proceedings does not vest in the condemnor until the judgment fixing just compensation is entered and paid." *Downey Coal*, 115 N.E.2d at 224. However, the court continued:

> It is equally true, however, that the title acquired by the condemnor upon payment of the award in condemnation relates back to the date on which the petition, in case of proceedings under the Eminent Domain Act, ..., is filed. Therefore, while the condemnation award was deposited with the county treasurer on May 16, 1952, and the Chicago Park District was on that date vested with the title to this property, the title then vested related back to May 11, 1951, when the petition for condemnation was filed.

*Id.* (internal citations omitted); *see also City of Chicago v. McCausland*, 379 Ill. 602, 41 N.E.2d 745, 747 (1942) ("It is also said that in law the land is regarded as being taken at the time the petition for eminent domain is filed.").

■ Subsequent Illinois Supreme Court decisions have identified several practical reasons supporting its adoption of the "relation-back" rule. First, the value of condemned land (in Illinois as well as in Indiana) is determined as of the date of the filing of the condemnation action and the condemnee will not be entitled to any increase in the land's value which may occur after that date. *See Bd. of Junior Coll., Dist. 504 v. Carey*, 43 Ill.2d 82, 250 N.E.2d 644, 647 (1969). Second, a condemnor secures the right to obtain title to property on the date it files a petition for condemnation. Thus, any interests in the property acquired by another after the filing of the petition are acquired subject to the condemnation proceedings and are necessarily subordinate to the rights of the condemnor. *Id.* at 646. Stated differently,

> [B]etween the time of filing the petition and the time that the award is actually paid by the condemnor, the owner of real estate cannot enter into long term leases, make improvements, or even maintain the property with hope of reimbursement, and certainly cannot sell it excepting subject to the proceedings then pending.

> The mere filing of a petition to condemn effectively encumbers the land, imposing a burden upon it, impeding its transfer, and *to that extent destroying the fee-simple estate of the owner.*

*Pub. Bldg. Comm'n v. Cont'l Ill. Nat'l Bank & Trust Co.*, 30 Ill.2d 115, 195 N.E.2d 192, 196 (1964) (emphasis added). In short, after a property owner's land is

condemned, he holds something less than legal title in fee to the property.

We fully concur with the Illinois Supreme Court's approach to the issue of passage of title in eminent domain cases. That is, while a condemnor's title to condemned property does not vest until final compensation is paid or tendered, we find that, for purposes of Indiana's property tax statutes, title should relate back to the date of the filing of the condemnation action.[17] The County notes that such a rule would be in apparent conflict with the rule in *Kinsey* that "[i]f no appeal is taken, at the end of ten days the title vests and *relates back to the date of payment.*" 87 Ind. 514, 1882 WL 6557 at *2 (emphasis added). We believe our holding can be reconciled with *Kinsey*. That is, while our Supreme Court was concerned in *Kinsey* with the date on which a *condemnor* should begin to enjoy the *benefits* of title, e.g., possession, we are concerned here with the date on which a *condemnee* should stop bearing the *burdens* of title, e.g., property taxes.[18]

Because we conclude that the Appellants are not liable for 2004 taxes on the Property because they did not hold legal title in fee on March 1, 2004, we need not address the Appellants' argument that it should only have to pay a prorated share of those taxes because the City took possession of the Property on March 5, 2004. However, we note that it is common practice in private real estate transactions for each of the parties to pay a prorated share of the taxes for the year in which the property changes hands. Eminent domain, on the other hand, amounts to a compulsory sale, and the property owner has no bargaining power to negotiate a pro rata split of property taxes. In any case, while prorating taxes might seem sensible and equitable, taxation, and therefore prorating, is a matter for our General Assembly. Indeed, the Illinois legislature enacted a pro rata tax statute shortly after the Illinois Supreme Court decided *Downey Coal. See Pub. Bldg. Comm'n*, 195 N.E.2d at 195; 35 Ill. Comp. Stat. Ann. 200/9–185 (West 1996).

In sum, we hold that the trial court's finding that the Appellants held legal title in fee to the Property on March 1, 2004, and therefore owed $30,784.87 for 2004 taxes, was final and in the nature of summary judgment. However, we find that the trial court erred in granting summary judgment in favor of the County as to the 2004 taxes. Specifically, we conclude that in an eminent domain proceeding, while title does not vest in the condemnor until final compensation is paid or tendered, that title relates back, for purposes of Indiana's tax assessment statutes, to the date of the filing of the condemnation action. The City filed its condemnation action on October 30, 2003. As such, the Appellants did not hold legal title in fee to the Property on March 1, 2004, and therefore are not liable for 2004 taxes.[19]

---

**17.** The so-called "relation-back" rule is further discussed in Annotation, *Rights in Respect of Real–Estate Taxes Where Property is Taken in Eminent Domain*, 45 A.L.R.2d 522, § 8 (1956 & Supp.2003).

**18.** We realize that under Indiana's eminent domain statutes these will often be two different dates, but such a result arises from the peculiar nature of an eminent domain proceeding. *See Indep.-Consol. Sch. Dist. v. Waldron*, 241 Minn. 326, 63 N.W.2d 555, 559 (1954) (referring to condemnation as a "forced" or "compulsory" sale); *see also* 3 Julius L. Sackman, Nichols on Eminent Domain § 9.01[3] (3d. ed.2005) (discussing the compulsory sale theory of eminent domain).

**19.** The County directs us to the Tennessee Supreme Court's opinion in *White v. Kelley*, 215 Tenn. 576, 387 S.W.2d 821 (1965), in support of its proposition that the Appellants still held legal title in fee to the Property on March 1, 2004, and are therefore liable for 2004 taxes. There, the issue was 1964 property taxes. The assessment date for 1964

We remand this cause to the trial court for an order requiring the Clerk of the Allen Circuit Court to release funds representing the 2004 taxes to the Appellants. As to Whichard, he did not appeal the trial court's order and is not entitled to be reimbursed for his share of the 2004 taxes ($82,536.22).

### Conclusion

The trial court did not abuse its discretion by excluding evidence of incentives offered by the City to potential developers, purchase agreements relating to the Property, and alleged inconsistencies in Sturges' testimony. Furthermore, while we find that the trial court's award of 2004 taxes to the County was essentially a grant of summary judgment, we reverse that grant of summary judgment and remand this cause to the trial court for an order requiring the County to deposit with the Clerk of the Allen Circuit Court funds representing the 2004 taxes of the Appellants.

Affirmed in part, reversed in part, and remanded with instructions.

SULLIVAN, J., and FRIEDLANDER, J., concur.

taxes was January 10, 1964. Condemnation actions were filed *after* that date, and the condemnees were found to be liable for 1964 taxes. That holding is consistent with our holding. Here, the issue is 2004 taxes. The assessment date for 2004 taxes is March 1, 2004. The condemnation action was filed

*before* that date, on October 30, 2003. Viewed in light of the rule we adopt today, the Tennessee Supreme Court correctly held that the property owners held title to the property on January 10, 1964, before the condemnation action was filed.