**IRMSCHER SUPPLIERS, INC., and Pella Corporation a/k/a Pella by Irmschers a/k/a Pella of Indiana a/k/a Pella Windows and Doors a/k/a The Pella Window Store, Appellants–Respondents,**

v.

**Scott SCHULER and Kelly Schuler, Appellees–Petitioners.**

No. 85A04–0809–CV–528.

Court of Appeals of Indiana.

July 22, 2009.

David L. Jones, Riley Bennett & Egloff, LLP, Indianapolis, IN, Attorney for Appellant, Pella Corporation.

Benjamin Ice, Carson Boxberger, LLP, Fort Wayne, IN, Attorney for Appellant, Irmscher Suppliers.

Stephen H. Downs, Tiede Metz & Downs, P.C., Wabash, IN, Attorney for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Scott and Kelly Schuler purchased thirty-two windows manufactured by Pella Corporation from Irmscher Suppliers, Inc. After the windows were installed in the home, the Schulers discovered that insects were entering their home through gaps around the screens. The Schulers sued Pella and Irmscher for a breach of the implied warranty of merchantability. After a bench trial, the trial court found that the windows did breach the implied warranty and awarded direct and consequential damages to the Schulers in the total amount of $47,827.85. On appeal, Pella and Irmscher argue that the trial court abused its discretion by admitting two letters from Irmscher to the Schulers reporting a Pella employee's conclusion that the windows were defectively designed, that the trial court erroneously concluded that the windows breached the implied warranty of merchantability, and that the trial court abused its discretion in calculating the damage award. We conclude that the letter was not double hearsay but rather was admissible as an admission by a party-opponent (because the conclusion was made by a Pella employee and reported by Irmscher, Pella's agent or intermediary) and an adoptive admission (because Irmscher manifested a belief in the truth of the Pella employee's statement). We also affirm the trial court's judgment that the windows breached the implied warranty of merchantability. But because we conclude that the trial court abused its discretion in calculating the amount of direct and consequential damages, we remand to the trial court with instructions to enter a new judgment.

### Facts and Procedural History

In August 2000, the Schulers paid $12,986.13 for thirty-two windows for the remodeling of their rural Wabash County home, which was believed to have been built in 1800 and was located near two hog farms. These windows were manufactured by Pella and sold to the Schulers by Irmscher, which carries both Pella products and products made by other manufacturers.[1] Twelve of the windows were fixed casement windows, which do not open, and twenty-two of the windows were hinged casement windows, which do open. The hinged casement windows were equipped with "Rolscreens,"[2] which are screens that can be pulled down when the windows are open to prevent the entry of insects but then rolled up and out of sight when the windows are closed. The Schulers chose this combination of products, in consultation with their contractor and an Irmscher salesperson, to be aesthetically pleasing and to obtain a flow of fresh air through the home when the windows are open. Each hinged casement window with a Rolscreen was priced as a single unit; that is, the invoices for the product did not itemize the cost of the window by itself and the cost of the Rolscreen by itself. The windows were delivered in October 2000 and installed in November 2000.

Before the remodeling, the Schulers experienced what they considered a normal number of occasional insects in their home. But beginning in the spring of 2001, the Schulers noticed an unusual number of insects in their home when the hinged casement windows were open, even though the Rolscreens were pulled down. The Schulers believed that the bugs were entering the home through gaps around the

---

1. Pella and Irmscher are separate entities.

2. Although these are referred to as "roll screens" in the Transcript, the parties and the trial court refer to them as "Rolscreens," and we will do likewise.

Rolscreens between the casements. Since 2001, the Schulers have had a large number of insects in their home every spring and fall. The Schulers, especially Kelly, killed and cleaned up after the insects to protect their five small children from the bugs. Kelly observed one window for two hours and kept a log of the number of insects, recording at one point that there were thirty-three insects on the inside of the screen and nine on the outside of the screen. Ex. p. 35.

In October 2001, the Schulers first contacted Irmscher about the problem with the Rolscreens. Irmscher sent technicians on several occasions to adjust the Rolscreens and attempted to solve the problem. However, nothing Irmscher did solved the problem with the insects. The Schulers then contacted Pella, who told the Schulers that it would look into the problem and would communicate with Irmscher about it. In the fall of 2003, Kelly videotaped bugs entering her home and gave the videotape to Dan Siela, an Irmscher employee. Siela forwarded the videotape to a Pella field quality engineer, who determined the Rolscreens were defectively designed. Irmscher then wrote two letters to the Schulers reporting the Pella field engineer's determination. These letters were written on Irmscher's letterhead, which includes the Pella logo. *Id.* at 17–18.

The Schulers brought suit against Irmscher and Pella, arguing that the windows did not meet the implied warranty of merchantability under Indiana Code § 26–1–2–314. At the June 2008 bench trial, the Schulers presented estimates from a home construction company showing that it would cost between about $39,400 and $47,695 to replace the thirty-two Pella windows with thirty-two double-hung windows with flat screens. Included in the Schulers' estimate is the $10,000 cost of replacing the vinyl siding on the home. The Schulers also presented evidence that Kelly had spent at least two hours per week in the spring and fall between 2001 and 2008 killing and cleaning up the bugs that had entered through the gaps around the Rolscreens. Tr. p. 84–85.

The trial court found for the Schulers, awarding $47,827.85 in direct and consequential damages to the Schulers, which included $8428 for their time killing and cleaning up insects and $39,399.85 to replace all thirty-two windows (which also included $10,000 to replace the vinyl siding). The trial court also ordered that the defendants were entitled to possession of the old windows. Pella and Irmscher filed a motion to correct error, which was denied. Pella and Irmscher now appeal.

## Discussion and Decision

Pella and Irmscher raise several issues on appeal challenging the trial court's judgment: (1) whether the trial court erred by admitting two letters from Irmscher reporting the Pella employee's conclusion that the windows were defectively designed, (2) whether the trial court erroneously concluded that the windows with Rolscreens breached the implied warranty of merchantability, and (3) whether the trial court erroneously calculated the Schulers' damages.

### I. Hearsay

First, Pella and Irmscher object to the admission of two letters written to the Schulers by Siela, an Irmscher employee, reporting a Pella employee's conclusion that the windows were defective. The letter, written on March 23, 2004, by Siela to the Schulers, provides in part:

> The field quality engineer from Pella Corporation visited our sales branch last week. One of the things we addressed with him was your insect issue and part of that discussion was the viewing of your video tape. After viewing the tape,

he and I thoroughly examined the rolscreen casements in our showrooms.

There is no denial from him, after viewing the tape, that the insects are coming through the windows (obviously). He further admitted this to be a design flaw, and he will work on getting the designs changed.

The bad news is that he had no answer for revamping your product to prevent this. He feels, as we do, that the only solution is to convert your windows to accept a flat screen. We will do this at no charge to you, including painting the wood pieces that we will need to replace.

Appellants' App. p. 97 (formatting altered). The letter Siela wrote on April 12, 2004, to the Schulers provides in part:

The Pella Field Quality Engineer paid us a visit a couple of weeks ago, and one of the issues we covered with him was your insect problem. He reviewed your tape, and we also examined units with rolscreens in our showrooms.

His conclusion is that this is a definite product flaw, but unfortunately, cannot come up with a solution to eliminate the insect infiltration completely with the rolscreens in place. However, I am allowed to offer you a total conversion from rolscreens to flat screens at no cost to you.

*Id.* at 98 (formatting altered). At trial, Pella and Irmscher argued that the letters included inadmissible double hearsay. The trial court admitted the letters over the defendants' objection.

■ "As a general matter, the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal." *Southtown Props., Inc. v. City of Fort Wayne ex rel. Dep't of Redev.*, 840 N.E.2d 393, 399 (Ind. Ct.App.2006) (quotation omitted), *trans. denied.* We will reverse only where the trial court's decision is clearly against the

logic and effect of the facts and circumstances. *Kempf Contracting and Design, Inc. v. Holland–Tucker*, 892 N.E.2d 672, 676 (Ind.Ct.App.2007), *trans. denied.*

■ Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). When a statement contains within it another statement, each layer of hearsay must qualify under an exception to the hearsay rule before the evidence at issue is admissible. *Barger v. Barger*, 887 N.E.2d 990, 993 (Ind.Ct.App.2008). However, a statement is not hearsay if the "statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity; or (B) a statement of which the party has manifested an adoption or belief in its truth; ... or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" Ind. Evidence Rule 801(d)(2). Here, the Schulers offered the letter as evidence to prove the truth of the matter asserted; that is, that the windows were defective.

■ The statements that the windows were defective were admissible against Pella for the truth of the matter asserted because they were made by a Pella employee charged with investigating the Schulers' insect situation, offered at trial against Pella, and reported by Irmscher, who was acting as Pella's agent or intermediary in regard to fixing the problems with the Pella windows. Evid. R. 801(d)(2)(A), (D).

■ The statements were admissible against Irmscher as an adoptive admission under Indiana Rule of Evidence 801(d)(2)(B). Indiana law on adoptive admissions since the adoption of the Indiana Rules of Evidence is scarce, but Indiana's

rule is identical to Federal Rule of Evidence 801(d)(2)(B), and we may use federal cases for guidance. *See Collins v. State*, 826 N.E.2d 671, 677 (Ind.Ct.App. 2005) (concluding that because defendant attempted to dispute witness's statement it was not admissible as adoptive admission), *reh'g denied, trans. denied; see also Ross v. Olson*, 825 N.E.2d 890, 895 (Ind. Ct.App.2005) (concluding that evidence did not support a conclusion that the witness made an adoptive admission), *trans. denied.* Federal Rule of Evidence 801(d)(2)(B) governing adoptive admissions does not require the party to specifically adopt another person's statements, but a "manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements, is all that is required for a finding of adoptive admission." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988), *reh'g denied.* We conclude that the Pella engineer's statements that the windows were defective were admissible against Irmscher because an Irmscher employee charged with handling the Schulers' insect situation offered to replace the windows, thereby manifesting Irmscher's adoption or belief in the truth of the Pella engineer's conclusion that the windows were defective. Evid. R. 801(d)(2)(B). Because both layers of statements were admissible, the trial court did not abuse its discretion by admitting the letter against Irmscher.

■ As a final matter on this issue, we note that the Pella and Irmscher employee declarants did not testify at trial and they were not required to do so for the letter to be admissible, contrary to the defendants' argument on appeal. Indiana Rule of Evidence 801(d)(2) does not include a require-

ment that the declarant testify at trial. *Cf.* Ind. Evidence Rule 801(d)(1) (which does contain a requirement that the declarant testify for the witness's prior statement to be admissible). In sum, the trial court did not abuse its discretion by admitting the letters into evidence.

## II. Implied Warranty of Merchantability

■ Next, Irmscher and Pella challenge the evidence [3] and findings supporting the trial court's conclusion that the windows with Rolscreens breached the implied warranty of merchantability under Indiana Code § 26–1–2–314.

The Schulers introduced evidence that each Rolscreen and hinged casement window was ordered and priced together as a single unit. Tr. p. 22–23; Ex. p. 10. The Schulers testified about the large numbers of flies, ladybugs, and other insects entering the home in the spring and fall when the windows were open and the Rolscreens were down. They also introduced a videotape showing insects entering through the gaps in the Rolscreens. Further, as described above, a Pella field quality engineer concluded that the windows were defective and Irmscher adopted a belief in that conclusion. The trial court determined that the Schulers' evidence demonstrating that the insects were infiltrating the home through the Rolscreens was credible.

The trial court issued its judgment in narrative form. The trial court did not separate its findings and conclusions into numbered paragraphs, but the findings and conclusions are evident from the judgment. Generally, when the trial court enters findings of fact and conclusions of law,

---

**3.** In their motion to correct errors, the defendants challenged the sufficiency of the evidence showing that the Rolscreens breached the implied warranty of merchantability. Ap-

pellants' App. p. 22. As a result, this sufficiency of the evidence claim is preserved for appellate review. *See Henri v. Curto*, 908 N.E.2d 196, 208 (Ind.2009).

its findings and conclusions shall not be set aside unless clearly erroneous. *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 171 (Ind.Ct.App.2007). A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made. *Id.* We review the judgment by determining whether the evidence supports the findings and whether the findings support the judgment. *Id.* We consider only the evidence favorable to the judgment and all reasonable inferences to be drawn from that evidence. *Id.* We neither reweigh the evidence nor assess witness credibility. *Id.*

■■■■ The implied warranty of merchantability,[4] as governed by Indiana Code § 26–1–2–314(1), provides that a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Additionally, subsection (2) requires that, for the goods to be merchantable, they must at least be such as are fit for the ordinary purposes for which such goods are used. The "implied warranty of merchantability is imposed by operation of law for the protection of the buyer and must be liberally construed in favor of the buyer." *Frantz v. Cantrell*, 711 N.E.2d 856, 859 (Ind.Ct.App.1999). In addition to sellers who are merchants with respect to goods of the kind at issue, "a consumer may sue a manufacturer for economic loss based on breach of the implied warranty of merchantability even if the consumer purchased the product from an intermediary in the distribution chain."

*Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 948 (Ind.2005).

■■■■ An action based on breach of warranty requires evidence showing not only the existence of the warranty but also that the warranty was broken and that the breach was the proximate cause of the loss. *Frantz*, 711 N.E.2d at 860. A good may breach the implied warranty of merchantability if it is defective as the result of an imperfection or dereliction. *See id.*

One of the ordinary purposes for which windows are used is to keep out the elements and insects. Here, the windows with Rolscreens failed to keep insects from entering the home. A window screen with gaps around the edges that fails to prevent insects from entering a dwelling cannot be said to "conform to ordinary standards and ... be of the same average grade, quality and value as similar goods sold under similar circumstances." *Jones v. Abriani*, 169 Ind.App. 556, 350 N.E.2d 635, 645 (1976). And there was evidence on the record that the windows with Rolscreens were priced and ordered as combined units, supporting the trial court's conclusion that the hinged casement windows and Rolscreens, rather than the Rolscreens alone, breached the implied warranty of merchantability. As such, the trial court's determination that Irmscher and Pella breached the implied warranty of merchantability is not clearly erroneous.

Nevertheless, Irmscher and Pella argue that the evidence is insufficient to show a breach of the implied warranty of merchantability because the Schulers were re-

---

4. The Uniform Commercial Code, as adopted by Indiana in Indiana Code §§ 26–1–1–101 to –10–104, provides two implied warranties—the implied warranty of merchantability under Indiana Code § 26–1–2–314 and the implied warranty of fitness for a particular purpose under Indiana Code § 26–1–2–315. The implied warranty of fitness for a particular purpose occurs where the seller has rea-

son at the time of contracting to know of any particular purpose for which the goods are purchased and the buyer is relying on the seller's skill or judgment to choose suitable goods. Ind.Code § 26–1–2–315. As the plaintiffs proceeded under the implied warranty of merchantability, *see* Tr. p. 88, only that warranty is at issue in this case.

quired to but failed to introduce evidence of the industry standard for the goods at issue. In support of their argument, the defendants cite *Easyrest, Inc. v. Future Foam, Inc.,* 2007 WL 2705582 (S.D.Ind. Sept.12, 2007), and evidence that Irmscher and Pella representatives had never before received a complaint about insects infiltrating the Rolscreens.

■ However, there are two problems with the defendants' argument. First, evidence that a product fails to meet the industry standard is but one way to show a breach of the warranty of merchantability. There are other ways to show a good is not merchantable, including a showing that the good is not fit for the ordinary purposes for which it was used. Here, the Schulers made such a showing. *Easyrest* does not command a different result. In *Easyrest,* the plaintiffs failed to introduce any evidence demonstrating that the product at issue failed to meet an industry standard and further stipulated that it would be impossible for testing to establish conclusively whether the product was defective. 2007 WL 2705582 at *2. We do not read this case to stand for the proposition that all plaintiffs must present evidence of the industry standard in order to prove a breach of the implied warranty of merchantability under Indiana Code § 26–1–2–314 (which is not cited in *Easyrest* ).

Second, even assuming *arguendo* that the Schulers were required to establish that the windows failed to meet the industry standard, there is sufficient evidence for the trial court to make this conclusion. Irmscher and Pella introduced evidence that Rolscreens had been manufactured since 1925 and there had never been a complaint about insects infiltrating through Rolscreens. But the Schulers introduced evidence, including the two letters from Siela, that the products were defective and failed to keep insects out, as all the previously sold Rolscreens had done

according to the defendants. In sum, we cannot say the trial court's judgment in this regard is clearly erroneous.

### III. Damages

Finally, the defendants raise numerous challenges regarding the award of damages to the Schulers. Irmscher and Pella argue that the trial court erroneously included the cost of replacing the fixed casement windows, that the trial court erroneously included the cost of replacing the hinged casement windows and Rolscreens instead of just the Rolscreens alone, that the trial court erroneously failed to deduct the scrap value of the windows from the award, and that the trial court erroneously failed to deduct the value of use for the time that the plaintiffs used the windows. The defendants also argue that the trial court erroneously included as consequential damages the cost of replacing the siding on the residence and the value of the time spent killing insects.

■ Generally, the computation of damages is a matter within the sound discretion of the trial court. *Steve Silveus,* 873 N.E.2d at 181. A damage award will not be reversed upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* at 182. In determining whether the award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.*

The trial court awarded the Schulers $8428 related to the plaintiffs' time spent killing and cleaning up after insects that had infiltrated the home through the Rolscreens. The trial court also awarded the Schulers $39,399.85 to replace the thirty-two windows with thirty-two double-hung Pella windows, which included a labor and material cost of $10,000 to replace all the vinyl siding on the home. The trial court allowed the defendants to retrieve and

keep the old windows if they desired to do so.

■ "One of the broad remedial goals of the Uniform Commercial Code is that the aggrieved party be put in as good a position as if the other party had fully performed, but not in a better position." *Gen. Motors Corp. v. Sheets*, 818 N.E.2d 49, 54 (Ind.Ct.App.2004), *trans. denied; see also* Ind.Code § 26–1–1–106. Indiana Code § 26–1–2–714 governs damages where the buyer has not rejected the goods or revoked acceptance[5] and provides:

(1) Where the buyer has accepted goods and given notification (IC 26–1–2–607(3)), he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances[6] show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under IC 26–1–2–715 may also be recovered.

■ We have found several appropriate measures to value direct damages under Indiana Code § 26–1–2–714. The primary focus of all these measures is whether the award of damages is reasonable.[7] Namely, we have approved in the past the following methods: (1) the cost of repair (but seldom have we allowed repair costs to exceed the initial value of the goods);[8] (2) the fair market value of the goods as warranted[9] minus the salvage value;[10] (3) the fair market value of the goods as warranted at the time of acceptance less the fair market value of the goods as accepted;[11] and (4) the replacement costs less the value of the plaintiff's use of the good up to the time of trial.[12] *See also Michiana Mack, Inc. v. Allendale Rural Fire Prot. Dist.*, 428 N.E.2d 1367, 1370 (Ind.Ct.App.1981) (listing the first three formulas).

■ As for consequential damages, Indiana Code § 26–1–2–715 provides that, in a breach of warranty case, incidental and consequential damages which are reasonably foreseeable may also be recovered. A plaintiff may recover consequential dam-

---

5. If the buyer has rightfully rejected the goods or revoked acceptance, damages are governed by Indiana Code § 26–1–2–711, which can provide for recovery of purchase price.

6. Some courts have applied the "special circumstances" provision to cases involving custom-made or unique goods and concluded that this provision allows the buyer to recover the replacement cost even if it is more than the contract price. *See, e.g., Gem Jewelers, Inc. v. Dykman*, 160 A.D.2d 1069, 553 N.Y.S.2d 890 (N.Y.App.Div.1990).

7. One authoritative treatise advises that "one should not overlook the invitation in 2–714(1) to measure damages 'in any manner which is reasonable.'" James J. White & Robert S. Summers, Uniform Commercial Code § 10–2, at 705 (5th ed. Practitioner's Ed.2006).

8. *See Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 955–56 (Ind.2001).

9. The contract price has been held to be competent evidence of the fair market value of the goods as warranted. *Carpetland U.S.A. v. Payne*, 536 N.E.2d at 306, 311 (Ind.Ct.App. 1989).

10. *See, e.g., Cimino v. Fleetwood Enters., Inc.*, 542 F.Supp.2d 869, 887 (N.D.Ind.2008) (citing *Ertel v. Radio Corp. of Am.*, 171 Ind.App. 51, 354 N.E.2d 783, 783–86 (1976)).

11. *See, e.g., Coyle Chevrolet Co. v. Carrier*, 397 N.E.2d 1283, 1286 (Ind.Ct.App.1979).

12. *Frantz*, 711 N.E.2d at 861.

ages if they are the direct, immediate, and probable result of the breach of an implied warranty. *Bob Anderson Pontiac, Inc. v. Davidson,* 155 Ind.App. 395, 293 N.E.2d 232, 236 (1973). The issue of whether claimed consequential damages are the foreseeable and proximate result of a breach of an implied warranty is generally determined by the trier of fact. *Id.*

We now turn to the case at hand. First, Pella and Irmscher challenge the portion of the replacement cost related to the twelve fixed casement windows. As for the cost to replace the twelve fixed casement windows, the Schulers introduced evidence that the twelve fixed casement windows and the twenty hinged casement windows with Rolscreens were purchased together as a functional and aesthetic system in consultation with both their contractor and an Irmscher sales representative. As such, the trial court could reasonably conclude that the defendants knew that the Schulers would need to replace all thirty-two windows if the Rolscreens were defective so that the windows on the plaintiffs' house would match and function together. We cannot say that the trial court abused its discretion in granting the Schulers damages for the cost of replacing the twelve fixed casement windows with double-hung windows.

Second, Pella and Irmscher challenge the amount of damages in excess of the original purchase price of the thirty-two windows. We agree with Pella and Irmscher that awarding the Schulers direct damages greater than the costs of the initial windows is not reasonable. Because the Schulers are replacing all the windows in their home with more expensive double-hung windows, the cost of replacement is not an appropriate measure of damages in this case, as the plaintiffs would receive something worth more than the original bargain. This damage award put the Schulers in a better position than had Pel-

la and Irmscher fully performed. We conclude that, in this case, the damages for replacement of the windows cannot exceed the initial value of the windows. Rather, a more reasonable method to determine damages is the difference between the fair market value of the goods as warranted and the salvage value. Since the trial court ordered that Irmscher and Pella are entitled to possession of the windows in question, they in essence received the salvage value of the windows. As such, we determine that the reasonable amount of direct damages related to the replacement costs of the windows in this case is the fair market value of the goods as warranted, which is $12,986.13, and accordingly order these damages reduced to that amount.

Additionally, Pella and Irmscher challenge the trial court's award of consequential damages in the amount of $10,000 to replace the vinyl siding on the home when the windows are replaced and $8428 related to the Schulers' time spent killing and cleaning up after insects on the ground that these damages were not reasonably foreseeable.

As for the cost to replace the vinyl siding on the home, it is reasonably foreseeable that defective windows might need to be replaced. *See Frantz,* 711 N.E.2d at 861 ("Moreover, the entire roof required replacement. The roof would have to be stripped of two layers of shingles and completely redone, a reasonably foreseeable consequence of the installation of the faulty shingles in question."). Two of the Schulers' witnesses, both of whom work in home construction and remodeling, testified that, based on their experience with siding, the vinyl siding on the home would need to be replaced because as siding ages it becomes faded and brittle, and therefore cannot be selectively replaced but must be entirely replaced. The Schulers introduced evidence that it would cost $10,000 in labor and materials to replace the sid-

ing. Ex. p. 32. Although the defendants introduced evidence that the windows could be replaced without destroying the siding, we will not reweigh the evidence or assess the credibility of witnesses on appeal. *See Carpetland U.S.A.,* 536 N.E.2d at 310. Because the trial court's award of $10,000 to replace the vinyl siding on the home is supported by the evidence and is not contrary to law, we affirm this award.

 As for the time spent killing and cleaning up after insects, we agree with the trial court that it is reasonably foreseeable that a family whose home has been infiltrated with insects will spend some time and energy addressing this problem, and it is therefore proper to award some consequential damages for the insects. However, the buyer also has a duty to minimize the damages. *See* Ind. Code § 26-1-2-715 ("Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know *and which could not reasonably be prevented by cover or otherwise* . . . .") (emphasis added).

Although it is reasonable that the plaintiffs might spend some short period of time killing insects while attempting to find a solution, *seven years* is not a reasonable amount of time, especially given that the defendants offered to replace the Rolscreens with flat screens at no cost to the plaintiffs as early as March 2004.

 Because the evidence is undisputed that the Schulers could have minimized their damages due to the ingress of insects by accepting the flat screens, the trial court abused its discretion by awarding the Schulers consequential damages for seven years of killing insects. *See* Ind.

Code § 26-1-2-715 Comment 2 ("Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise."). "A buyer cannot pile up damage by continuing to use an article when he knows that such damage will be the result and then claim that the loss is the proximate result of the breach of warranty." *Schaefer v. Fiedler,* 116 Ind.App. 226, 63 N.E.2d 310, 314 (1945) (holding under pre-UCC law that the buyer was not entitled to consequential damages for the time required to combine his soybean crop in excess of the time required if the machine had been fit because he knew the machine's condition but used it nevertheless).

Because the evidence shows that the Schulers failed to minimize their damages, as they were required by statute to do in order to receive consequential damages, we reduce this portion of the award to $3612 (by dividing $8428 by 7 to reach the value of one year of killing insects, and then multiplying that value by 3, which represents the three years from the Spring of 2001 to the Spring of 2004, when the Schulers received the offer to replace the screens).

In conclusion, we affirm in part and remand for the trial court to enter a new judgment for damages in the amount of $38,158.13.[13]

NAJAM, J., and FRIEDLANDER, J., concur.

---

**13.** We reach this calculation by adding the following amounts:

$12,986.13 (related to the replacement of the windows)

+ $10,000.00 (related to the labor to replace the windows)
+ $10,000.00 (related to the replacement of the siding)
+ $1560.00 (related to the labor to finish paint the windows)
+ $3612.00 (related to the time spent killing and cleaning up insects)

*See* Appellants' App. p. 32 (Then & Now Construction estimate used by the trial court to calculate damages).