

FILED

Mar 27 2026, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Court of Appeals of Indiana

Aaron Gregory Fowler,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

March 27, 2026

Court of Appeals Case No.
25A-CR-1910

Appeal from the Marion Superior Court

The Honorable James K. Snyder, Judge

Trial Court Cause No.
49D32-2401-F1-2097

---

**Opinion by Judge Brown**
Judges Altice and DeBoer concur.

**Brown, Judge.**

[1] Aaron Gregory Fowler was convicted, following a jury trial, of twenty-three counts including multiple counts of child molesting, child solicitation, child exploitation, sexual misconduct with a minor, possession of child pornography, unlawful possession of a firearm by a serious violent felon, and attempted obstruction of justice. On appeal, he asserts that the trial court abused its discretion in admitting certain evidence and that the State presented insufficient evidence to support his conviction for attempted obstruction of justice as a level 5 felony. We affirm.

## Facts and Procedural History

[2] In March 2023, forty-seven-year-old Fowler met thirteen-year-old N.S. when N.S. and her mother, Betty S., were dropping groceries off at the apartment of N.S.'s older sister, Cierra. N.S. visited Cierra's apartment frequently, and Fowler was present about "80 percent" of the time that N.S. was there. Transcript Volume V at 30. On one occasion, N.S. talked to Fowler "about school" which at the time was "James A. Garfield 31," an elementary and middle school. *Id*. at 29. N.S. "told [Fowler] how old [she]was" and so did her mother, Betty. *Id*. at 125.

[3] On March 17, 2023, N.S. was at Cierra's apartment when Fowler and his son Ziah came over. They "all ate dinner . . . were hanging out, watching a movie." *Id*. at 30. N.S. "went to bed" between "10:00 and 11:00." *Id*. at 30, 34. At 3:00 a.m., Fowler woke her up and told her to come into the living

room. N.S. went to the bathroom, and when she came into the living room, Fowler was on the couch. When she approached him and asked, "Hey what do you need," Fowler "kissed" N.S. on the mouth and "pulled [her] on the couch." *Id*. at 35. At that point, Fowler was "on top of" N.S. *Id*. at 36. Fowler "pull[ed] down [N.S.'s] shorts" and underwear, and "put his penis" inside her vagina. *Id*. at 36, 39. When "the sex was done," N.S. went back to the room she had been sleeping in and "wrote down [her phone] number" and gave it to Fowler. *Id*. at 41.

[4] N.S. did not speak with Fowler again until June or July 2023, when Fowler began texting N.S. "[F]rom there, [Fowler and N.S.] started talking about everything, like, anything and everything that [they] could talk about." *Id*. at 43. They would talk in person, through text, or by way of video calls. If Fowler's son was nearby, Fowler would end his calls with N.S. because he did not want his son to know about the relationship. N.S. assumed that Fowler did not want his son to know about the relationship because it "was illegal." *Id*. at 74. At some point, Fowler asked N.S. to be his girlfriend. During their relationship, Fowler and N.S. exchanged 891 text messages with 150 attachments that included pictures of N.S. in various states of undress.

[5] On one occasion in June or July 2023 when her family "was out at the racetrack at Speedrome," Fowler came to N.S.'s house and she let him in through the front door. *Id*. at 46. Fowler and N.S. had sexual intercourse upstairs in N.S.'s bedroom. N.S. also performed oral sex on Fowler. Fowler left briefly to go home and shower, but he returned later and again had sexual

intercourse with N.S. Betty, who was still not home, "video called" N.S. and noticed that N.S.'s "shirt was on backwards." *Id*. at 51. After Betty told N.S. that she was "coming home soon" and seemed to "suspect[] something was happening," Fowler "got spooked" and left. *Id.*

[6] Also in July 2023, Fowler arrived at N.S.'s house one night after her family was asleep. Fowler parked on a street nearby and walked to the residence. N.S. met Fowler in the backyard. The two engaged in "[s]ex and oral." *Id*. at 53.

[7] On August 19, 2023, Betty "popped open [N.S.'s] door" and caught N.S. on a video call with Fowler. *Id*. at 9. Betty became angry, took away N.S.'s phone, and grounded her. Rather than disclosing her relationship with Fowler, N.S. told Betty that she was just "trying to find marijuana somewhere." *Id*. at 56. Betty did not believe N.S. so, that same day, Betty sent Fowler several messages on Facebook Messenger. In one message, Betty threatened Fowler to leave N.S. alone and stated: "[Y]ou cannot tell me not one bit that [] you did not know you were talking to a 13-year-old child and be that you did not know that it was [N.S.] and then you hang up the minute you see my ass on the screen . . . I feel you're a f* child molester . . . a baby rapist." Exhibits Volume IV at 131. Betty began another message with, "Listen you know how old [N.S.] is . . . ." *Id*. at 132. Betty tried to call Fowler multiple times, but he did not answer the calls. A short time later, Fowler messaged back, tried to convince Betty that maybe N.S. was looking to buy weed or perhaps his son was the one interacting with N.S. Betty again referenced N.S.'s age by saying, "I got a 13 year old kid

telling me s[h]e trying to buy weed from a grown ass man." *Id*. at 133.[1] Fowler responded that he has three daughters and that his friends could vouch for him that he "don't play" around with kids, that Betty was "right," that he understood Betty's anger as a mother, and that he owed her an apology. *Id.* Fowler never denied knowing that N.S. was only thirteen years old.

[8] After Betty took away N.S.'s phone, Fowler delivered three phones to N.S. by tying "them up in a grocery bag" and placing them in a dumpster behind her house. Transcript Volume V at 57. N.S. turned fourteen years old in August 2023. On her birthday, she sent Fowler a picture of herself from school wearing a dress. Fowler responded, "Beautiful happy birthday day lady." Exhibits Volume II at 43.

[9] Betty gave N.S. her phone back in November 2023. N.S. and Fowler continued communications and their relationship. In January 2024, Fowler drove over to N.S.'s home and parked on a street nearby. N.S. left her house and met Fowler in his car. Fowler placed his penis in N.S.'s vagina and in her mouth, and he placed his mouth on her vagina. On January 13, 2024, N.S. again snuck out of her home, met Fowler, and they drove to his apartment. Fowler gave N.S. alcohol and they had sexual intercourse multiple times. Fowler handed N.S. his phone to record one of the sexual encounters. The recording was created at 2:11 a.m. on January 13, 2024.

---

[1] Betty's initial message was sent at 5:36 p.m. Fowler's responses began shortly after 6:00 p.m.

[10] That morning, Betty woke up earlier than usual and discovered N.S. was not home. Betty located N.S.'s phone and discovered calls and messages from Fowler. Betty, N.S.'s sister, and her father tried to call Fowler, but he had turned off his phone. When he turned his phone back on, Fowler texted N.S.'s family that he had been asleep. As N.S. hid in a garage area, Fowler filmed a video of the inside of his apartment to send to her family to prove that she was not there. Fowler then drove N.S. home and dropped her off a street away from the residence. Upon returning home, N.S. did not immediately disclose her whereabouts. However, N.S. eventually revealed her sexual relationship with Fowler to her family.

[11] Betty reported the relationship to police. N.S. spoke with police and Department of Child Services investigators and went to the Center of Hope for a medical evaluation. Also, on January 19, 2024, law enforcement executed a search warrant at Fowler's apartment and located two firearms. One of the firearms was in a chest of drawers along with Fowler's debit card, phone, and wallet.

[12] Fowler instructed N.S. to delete anything on her phone involving him so that her parents would not discover their activities. N.S. followed that instruction. Fowler deleted data from his phone on January 7, 16, and 19, 2024.

[13] On January 22, 2024, the State charged Fowler with three counts of child molesting as level 1 felonies, four counts of sexual misconduct with a minor as level 4 felonies, child exploitation as a level 5 felony, and unlawful possession

of a firearm by a serious violent felon as a level 4 felony. On February 14, 2024, the State filed an amended information adding ten counts of possession of child pornography as level 6 felonies, two counts of child solicitation as level 5 felonies, and one count of contributing to the delinquency of a minor as a level 6 felony. The State also subsequently alleged that Fowler was an habitual offender.

[14] On May 5, 2025, while Fowler was incarcerated at the Marion County Jail, Indianapolis Metropolitan Police Detective Lauren Carmack retrieved a handwritten letter Fowler placed in out-going mail. In the letter, Fowler directed the recipient to locate an individual named "Mike" and stated: "I'm trying to pay him or get him to write a statement saying that's his brother hand writing . . . . He got to say how he know me . . . he's like an uncle. He got to say that his brother hand writing . . . . He's a weed head so if he don't do it for free, shit a $20 would work." Exhibits Volume IV at 154. Fowler explained that he needed the recipient to do this because "they" think Fowler wrote "Dre['s]" witness statement. *Id*. The letter included a copy of a purported witness statement written on his behalf titled "Declaration of Andre Brewer" that Fowler had previously filed with the court. *Id*. at 156. The letter also directed the recipient to contact Fowler's friend "Larry" to fabricate a lease for Fowler's apartment "so it will look like someone with a gun [permit] stayed there other than me," and to have Larry's son "Jared" copy a gun permit that Fowler could "show the court" to suggest that Jared was on the lease and owned the firearm found in the apartment. *Id*. at 154-155. Fowler made

several jail phone calls discussing the letter. On May 29, 2025, the State filed an amended information against Fowler adding one count for attempted obstruction of justice as a level 6 felony and one count for attempted obstruction of justice as a level 5 felony.

[15] A jury trial began on June 9, 2025. During trial, Betty testified that on one occasion, she "popped open [N.S.'s] door" and caught N.S. on a video call with Fowler. Transcript Volume V at 9. When asked, if she had ever confronted Fowler "over social media," Betty responded, "Yes." *Id*. at 11. When asked, "In what platforms," Betty responded, "It was TikTok and on [Facebook] Messenger." *Id*. The prosecutor showed Betty a copy of the messages she sent to Fowler over Facebook Messenger and his responses, she stated they were true and accurate copies of those messages, and the prosecutor moved to admit the messages as State's Exhibit 294. Fowler's counsel objected on hearsay grounds. Specifically, Fowler's counsel argued that, although Fowler's responses to Betty's text messages "would all be admissible," Betty's text statements were hearsay. *Id*. at 13. After initially sustaining the hearsay objection, the court ultimately overruled the objection and admitted State's Exhibit 294. At the conclusion of trial, the jury found Fowler not guilty of contributing to the delinquency of a minor but guilty on all remaining counts. He waived a jury trial on the second phase of trial for unlawful possession of a firearm and the habitual offender enhancement. Following a bench trial, the court found that Fowler was a serious violent felon and an habitual offender. A

sentencing hearing was held on July 8, 2025. The court sentenced Fowler to an aggregate executed term of 119 years.

**Discussion**

**I.**

[16] Fowler asserts that the trial court abused its discretion in admitting State's Exhibit 294, and specifically "N.S.'s mother's hearsay statement[s] about telling Fowler N.S.'s age." Appellant's Brief at 17. The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016).

[17] Hearsay is "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay is generally inadmissible, subject to a handful of specific and limited exceptions. *Cornell v. State*, 139 N.E.3d 1135, 1143 (Ind. Ct. App. 2020), *trans. denied*; Ind. Evidence Rule 802.

[18] During trial, in response to Fowler's hearsay objection to the admission of State's Exhibit 294, the prosecutor asserted that Betty's statements contained therein were admissible because she, the declarant, was present and testifying

and available for cross-examination.[2] We agree with Fowler that the State "essentially was arguing the old Patterson rule" that "has been dead for well over three decades." Appellant's Brief at 19. As the Indiana Supreme Court noted in *Warren v. State*, 725 N.E.2d 828, 835 n.1 (Ind. 2000):

> Under the old 'Patterson Rule' an out-of-court statement not given under oath could be considered as substantive evidence so long as the declarant was available at trial for cross-examination. *Patterson v. State*, 263 Ind. 55, 324 N.E.2d 482 (1975)). As a result of this Court's opinion in *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991) and the later adoption of the Indiana Rules of Evidence, the 'Patterson Rule' has been completely abrogated. Consequently, regardless of whether the declarant is available at trial for cross-examination, a hearsay statement is not ordinarily admissible as substantive evidence.

[19]     After initially sustaining Fowler's hearsay objection, the trial court ultimately overruled the objection stating, "when someone is making an out of court statement such as you're having a relationship with a 13-year-old child goes unrebutted. . . [t]his is admissible. And I think it's because based on the

---

[2] On appeal, the State changes course and asserts that Betty's messages to Fowler accusing him of knowing that N.S. was thirteen years old, were not hearsay because they were not offered to prove the truth of her statements – that is, they were not offered to prove that Fowler knew N.S. was thirteen years old but instead "to show that [Betty] told [Fowler] that N.S. was thirteen years old." Appellee's Brief at 17. We believe that this is a distinction without a difference. In other words, we agree with Fowler that the messages were at least, in part, offered to prove the truth of the matter asserted therein – that is, that Fowler knew that N.S. was thirteen years old.

statements that are made not only by [Betty] and Mr. Fowler's silence." Transcript Volume V at 13.[3]

[20] We believe the trial court was referring to Ind. Evidence Rule 801(d)(2)(B) which excludes from the definition of hearsay a statement "offered against an opposing party" that "is one the party manifested that it adopted or believed to be true." This Court has observed that "Indiana law on adoptive admissions since the adoption of the Indiana Rules of Evidence is scarce, but Indiana's rule is identical to Federal Rule of Evidence 801(d)(2)(B), and we may use federal cases for guidance." *Lancaster v. State*, 153 N.E.3d 1144, 1148 (Ind. Ct. App. 2020) (quoting *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1046-1047 (Ind. Ct. App. 2009)), *trans. denied*. "The federal rule governing adoptive admissions 'does not require the party to specifically adopt another person's statements, but a 'manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements, is all that is required for a finding of adoptive admission.'" *Id.* (quoting *Irmscher*, 909 N.E.2d at 1047 (quoting *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988))). The Indiana Supreme Court has held that "[a]n equivocal response to an assertion of fact which, if true, a reasonable person would be expected to deny, is an adoptive admission which may be admitted as evidence tending to show the truth of the assertion." *Miller v. State*, 500 N.E.2d 193, 195 (Ind. 1986)

---

[3] Fowler conceded that his statements in response to Betty's messages set forth in Exhibit 294 were admissible.

(citing *Robinson v. State*, 266 Ind. 604, 611-612, 365 N.E.2d 1218, 1223 (1977) (holding that "[s]ilence or an equivocal response to an assertion of fact, which, if true, a reasonable man would be expected to deny, is admissible as evidence tending to show the truth of the assertion, if the person is not in custody when the assertion is made, and the person has an opportunity to speak") (internal citations omitted)).

[21] Here, Betty stated multiple times in her messages that N.S. was thirteen years old and that she believed Fowler knew that. Betty also tried to immediately call Fowler, and he refused to answer. When Fowler did respond to the messages, he did not deny, disagree with, or refute Betty's statements regarding N.S.'s age. Rather, he was silent on that issue and went a step further by telling Betty she was "right" and apologizing to her stating that he understood her parental worries. Exhibits Volume IV at 133.

[22] We acknowledge that, generally, adoptive admissions occur in the context of an in-person communication and there is nuance involved here in that Betty's statements were made over instant messaging and not in Fowler's physical presence. Indeed, these types of social media or text exchanges do not necessarily occur in real time, with messages not being read or responded to immediately upon receipt. Further, individuals may begin a communication with instant messaging before quickly switching to another form of communication such as a phone call or in-person meeting. In fact, Betty did try to switch to phone communication and, if Fowler had answered her calls, his silence or equivocal responses to her instant messages would be less telling.

However, these parties continued their communication only through instant messaging, and when Fowler did respond to Betty's messages, his responses indicated that he understood the nature of the accusatory statements and that they were assertions a reasonable person would be expected to deny. In light of the circumstances surrounding Betty's messages and Fowler's responses, we conclude that the trial court did not abuse its discretion in determining that Betty's statements regarding N.S.'s age were admissible as adoptive admissions.[4] *See Lancaster*, 153 N.E.3d at 1148 (defendant's failure to deny, disagree with, or refute his brother's out of court statement at the time it was made supported trial court's finding that the statement was admissible as an adoptive admission).

[23] Even if Betty's statements were hearsay, their erroneous admission would not warrant reversal because any alleged error was harmless. As the Indiana Supreme Court recently reiterated, our harmless-error analysis is found in Appellate Rule 66(A):

---

[4] Fowler relies on *People v. McDaniel*, 251 Cal. Rptr. 3d 519 (Cal. Ct. App. 2019), for the broad proposition that "the logic for applying the adoptive admission exception to the rule against hearsay falls apart when the communications are made via instant messaging." Appellant's Reply Brief at 8. We find this case factually distinguishable and unpersuasive under the circumstances. *See McDaniel*, 251 Cal. Rptr. 3d at 530 (observing that there "was no evidence as to whether and when McDaniel read the text message in which his mother suggested he had robbed multiple local stores. To the extent he read it, it was entirely possible he responded to it by calling his mother or talking to her in person. Considering the distinctive nature of text messaging, the instant record provides no basis for a conclusion, in the first instance, that McDaniel, with knowledge of his mother's statement, in fact failed to deny or respond to it and, in turn, that he thereby adopted it" and further observing "there was not an adequate showing that McDaniel had in fact failed to respond to or deny his mother's indirect accusation . . . a response or denial was not necessarily warranted under the circumstances . . . [and] there was no other evidence of McDaniel's reaction to his mother's statement that showed adoption of it on his part").

> No error or defect in any ruling or order or in anything done or omitted by the trial court or by any of the parties is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.

*Hayko v. State*, 211 N.E.3d 483, 491 (Ind. 2023). "Under this test, the party seeking relief bears the burden of demonstrating how, in light of all the evidence in the case, the error's probable impact undermines confidence in the outcome of the proceeding below." *Id*. at 492. "[W]e consider the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case." *Id*. "Ultimately, the error's probable impact is sufficiently minor when—considering the entire record—our confidence in the outcome is not undermined." *Id*.

[24] Here, to convict Fowler of the multiple counts of level 1 felony child molesting and level 4 felony sexual misconduct with a minor, the State was not required to prove Fowler knew N.S.'s age. *Wilson v. State*, 997 N.E.2d 38, 44 (Ind. Ct. App. 2013). Rather, it was Fowler's burden to establish by a preponderance of the evidence that he reasonably believed N.S. to be fourteen years of age or older (as to the level 1 felony child molesting counts) or sixteen years of age or older (as to the level 4 felony sexual misconduct with a minor counts). *See Moon v. State*, 823 N.E.2d 710, 715 (Ind. Ct. App. 2005) (observing that a defendant's reasonable belief regarding the victim's age is a defense under the specific terms of the child molesting statute that the defendant has the burden to prove by a preponderance of the evidence), *reh'g denied*, *trans. denied*.

Nonetheless, the State bore the ultimate burden of negating beyond a reasonable doubt any defense the defendant sufficiently raised. *Bradford v. State*, 675 N.E.2d 296, 300 (Ind. 1996).

[25] Considering all the evidence before the jury, we believe the State negated Fowler's defense, and our confidence in the outcome is not undermined. Specifically, Betty's statements were cumulative of other evidence on this issue before the trier of fact. In response to a question posed by the jury, N.S. testified, without objection, that she told Fowler her age and that her mom had also told him her age. She also testified that she spoke with him about school during their very first meeting, and that he knew she attended an elementary and middle school. The record further reveals that Fowler wished N.S. happy birthday on her fourteenth birthday in August 2023. There was also ample evidence in the record that Fowler went to great lengths to hide his relationship with N.S. from her parents, even going so far as to fabricate a story that his son, who was younger than N.S., had some kind of relationship with her. Finally, while incarcerated, Fowler annotated the back of photos of N.S. One photo says "she was 14 in this one" and the other says "she was 13 in this one" indicating that he recognized N.S.'s young age at different stages of their relationship. Exhibits Volume IV at 159-161. As the challenged evidence was merely cumulative of other evidence, Fowler has failed to show that the probable impact of the alleged erroneous admission of Betty's statements— considered in light of all the evidence—undermines confidence in the verdict. Any error was therefore harmless.

## II.

[26]     We next address Fowler's challenge to the sufficiency of the evidence to support his conviction for attempted obstruction of justice as level 5 felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id*. The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id*.

[27]     Ind. Code § 35-44.1-2-2(b)(1) provides that a person commits obstruction of justice, as a level 5 felony if "during the investigation or pendency of a domestic violence or child abuse case" the person knowingly or intentionally:

> offers, gives, or promises any benefit to . . . any witness to abstain from attending or giving testimony, or to give a false or materially misleading statement, at any hearing, trial, deposition, probation, or other criminal proceeding or from giving testimony or other statements, including giving a false or materially misleading statement, to a court or law enforcement officer under IC 35-31.5-2-185.

Ind. Code § 35-41-5-1 provides that a person "attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward the commission of the crime." It is well established that a conviction may be sustained on

circumstantial evidence alone. *Warren v. State*, 725 N.E.2d 828, 834 (Ind. 2000).

[28] We observe that the jury here was instructed that to convict Fowler of attempted obstruction of justice as a level 5 felony, the jury must find that Fowler "wrote a letter offering to pay someone money to create a false witness statement." Appellant's Appendix Volume IV at 31. The record reveals that Fowler's letter that was confiscated in the jail mailroom explained that he was concerned that "they" believed he, rather than Brewer, wrote Brewer's witness statement. Exhibits Volume IV at 154. Accordingly, Fowler asked the letter's recipient to pay "Mike," whom he described as Brewer's brother, $20 to authenticate the statement by claiming that he recognized the statement as being authored in Brewer's handwriting. *Id.* Fowler detailed in the letter how Mike could justify his own relationship with Fowler and why he could confirm the handwriting was his brother's and not Fowler's. The letter went on to request additional fabrications when it came to the lease for Fowler's apartment. From this evidence, a reasonable jury could infer that Fowler was attempting to use Mike to make a false statement as to the authenticity of Brewer's witness declaration. We conclude that the State presented evidence of probative value from which a reasonable jury could find Fowler guilty of attempted obstruction of justice.

[29] For the foregoing reasons, we affirm Fowler's convictions.

[30] Affirmed.

Altice, J., and DeBoer, J., concur.


ATTORNEYS FOR APPELLANT

Talisha Griffin
Christopher Taylor-Price
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Jennifer Anwarzai
Deputy Attorney General
Indianapolis, Indiana