**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANTS
BENITO S. GAMBA, HILDA P.
GAMBA AND GAMBA REAL ESTATE
HOLDINGS, LLC:

**MICHAEL T. TERWILLIGER**
Valparaiso, Indiana

**BRIAN CUSTY**
Merrillville, Indiana

ATTORNEY FOR APPELLANT
TICOR TITLE INSURANCE CO.:

**JOHN H. HALSTEAD**
Querrey & Harrow
Merrillville, Indiana

ATTORNEY FOR APPELLEE
THE ROSS GROUP, INC.:

**GERALD M. BISHOP**
Gerald M. Bishop & Associates
Merrillville, Indiana



FILED

Dec 28 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

BENITO S. GAMBA, HILDA P. GAMBA and )
GAMBA REAL ESTATE HOLDINGS, LLC )
                                  )
    Appellants-Defendants,        )
                                  )
        vs.                       )        No. 45A03-1202-PL-92
                                  )
THE ROSS GROUP INC.,              )
                                  )
    Appellee-Plaintiff.           )
_____)
                                  )
TICOR TITLE INSURANCE COMPANY     )
                                  )
    Appellant (Third Party Defendant) )
                                  )
        vs.                       )
                                  )

THE ROSS GROUP, INC.,                         )
BENITO GAMBA, HILDA GAMBA and                 )
GAMBA REAL ESTATE HOLDINGS, LLC.              )
                                              )
      Appellees-Plaintiffs/Defendants.        )

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Diane Kavadias Schneider, Judge
Cause No. 45D01-0606-PL-53

**December 28, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

**Case Summary**

After the construction of Benito and Hilda Gamba's (collectively, "Gamba") restaurant went over budget in 2006, the project contractor, the Ross Group ("Ross"), filed mechanic's liens for the construction-cost overage. A three-party dispute ensued among Gamba, Ross, and Ticor Title Company ("Ticor"), the company responsible for disbursing construction funds to Ross. In 2010, a trial court concluded that Gamba was liable for the overage and that Gamba and Ticor were not entitled to relief on any theory they put before the court. All three parties now appeal, asserting different theories of trial-court error. We affirm all but two of the trial court's conclusions in this case, including its determination that Gamba is liable for the overage. On the issues of Ticor's right to indemnification and the amount of a subcontractor's lien, we reverse.

**Facts and Procedural History**

This case involves three contracts.[1] The first is the June 2005 contract between Gamba and Ross for the construction of what would be Gamba's third restaurant in Merrillville, Indiana. When Ticor agreed to disburse Gamba's construction funds to Ross, the parties executed the second and third contracts at issue, the Construction Loan Disbursement Agreement ("the disbursement agreement") and the Contractor Indemnity Agreement ("the indemnity agreement"). Four parties signed the disbursement agreement: Paul B. Thiel for Centier Bank,[2] Ross Pangere ("Pangere"), CEO of Ross, Hilda Gamba,[3] and a Ticor commercial escrow manager. Gamba's App. p. 140.

The key portions of the disbursement agreement set forth contractor and owner indemnification duties:

> Contractor's Indemnification: Contractor . . . indemnifies and saves Ticor harmless from any and all losses . . . including attorney's fees[,] which Ticor may incur under the aforementioned commitment or policy and the endorsements thereto or under this Escrow agreement, arising from any mechanic's lien and materialmen's liens . . . pursuant to the Contractor's construction contract with Owner or from any erroneous information which Contractor . . . may have provided Ticor Title, or from the breach of any warranty or covenant made by Contractor to Ticor Title.

> Owner's Indemnification: Because Contractor is an agent of Owner for purposes of the construction project, Owner shall be responsible to Ticor Title for the performance of Contractor's obligations in connection with said indemnification.

---

[1] In setting forth the facts, we reiterate the applicable standard of review: we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn from that evidence. *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1047-48 (Ind. Ct. App. 2009). Gamba's statement of facts does not comport with this standard of review.

[2] Centier Bank loaned Gamba the funds for construction.

[3] Hilda Gamba's signature appears underneath another signature which is not legible.

3

*Id.* at 139. The indemnity agreement included similar contractor-duty provisions:

> Contractor agrees to hold and save Ticor Title harmless from and against any and all damage caused or charges, including attorney's fees and expenses of every kind and nature which Ticor Title might sustain, incur under or by reason of in consequence of issuing any such policy of title insurance insuring against damage by reason of said mechanic's liens gaining priority over the interest of any insured of Ticor Title.

> Contractor agrees to reimburse Ticor Title for any and all costs, including attorney's fees, expended by Ticor Title in enforcing this agreement.

*Id.* at 222. From the beginning, Gamba envisioned a high-end restaurant and expressed this desire to Ross and the other project contractors, including the architects, Jordan Mozer & Associates ("JMA"). After Gamba approved a design plan, Ross drafted a proposal. In that document, Ross indicated that the company's lump-sum proposal amount for the project was $2,227,197. *Id.* at 71. The contract also included allowances for major construction expenses, such as excavation, landscaping, masonry, carpentry, plumbing, and electrical work. *Id.* In a section entitled "Clarification & Exceptions," the proposal provided that "the allowances for this project will be adjusted as those items are detailed and firm pricing is obtained." *Id.* at 77. In June 2005, after discussing the document's terms, including allowances, Gamba approved and signed the proposal.

During construction, Ross and the other contractors held frequent meetings with Gamba to give progress reports. As construction continued, Gamba made a number of changes to the plans, which increased construction costs. Although the contract did not require the use of change orders, change orders were used to describe most of these changes. One major change was the increase of the restaurant's exterior wall height,

4

which was detailed in change order 12. *Id.* at 91. By November 2005, proposed costs had been exceeded by more than $200,000.

Ticor set up a draw process to pay Ross. As portions of the project were completed, Ross would submit requests for payment, called draws, and Ticor would pay Ross. With each draw, Ross also submitted lien waivers corresponding to the work completed. The lien waivers provided:

> Therefore, the undersigned waives and releases unto the Owner of said premises any and all lien claims whatsoever on the above described property and improvements thereon on account of labor and/or material, furnished by the undersigned thereto, and further certified that no other party has claim or right to a lien on account of any work performed or material furnished to the undersigned for said project, and within the scope of this affidavit and waiver.

*Id.* at 175-203. Ross would also indicate the cost of the work performed in relation to the lump-sum proposal. Ross did not submit any requests for payment or lien waivers for the overage through the draw process.

Near the end of 2005, communication between Ross and Gamba broke down. Ross sent letters to Gamba's work and home addresses, detailing the overage, which had reached approximately $220,000. Ross and Gamba eventually met to discuss the problem, but Gamba refused to pay the overage. Gamba and Ross's attorneys also tried to reach an agreement, but they were unsuccessful.

In May 2006, Ross filed a mechanic's lien for $729,941.89. *Id.* at 56. The mechanic's lien was calculated as follows:

Job Cost Subtotal: $2,532,971.46
Markup (12.5%): 316, 496.43
Proj. Mgr. / Supt. 110, 962.20
Total Job Cost: $2,959.430.09

5

        Less Paid to Date:    $2,229,488.20
        Lien Amount:             $729,941.89

*Id.*   Other project contractors also filed mechanic's liens for unpaid work: JMA for

$16,151.83, and Circle R, an electrical subcontractor, for $46,495.87.

        One month later, Ross filed a complaint in Lake Superior Court, seeking damages

for breach of contract, foreclosure of its mechanic's lien, attorney's fees, and

prejudgment interest.  Gamba counter-claimed against Ross, alleging slander of title, and

counterclaimed against both Ross and Ticor for breach of the indemnity agreement.[4]

Ticor asserted a claim against Ross for indemnification, alleging that Ross had breached

the disbursement and indemnity agreements by filing a mechanic's lien at the end of the

project.

        After a three-day bench trial in late 2010, the trial court entered judgment on the

evidence in Ross's favor.   The court set forth the following findings regarding the

Gamba-Ross construction contract:

> On June 2, 2005, Ross presented Gamba with a lump-sum proposal to
> construct the restaurant for Gamba for $2,227,197. The proposal
> conditioned the price on the existing JMA drawings, listed certain
> exclusions, and stated the following stated allowances:
>
>> $25,000 for landscaping
>> $140,000 for masonry
>> $85,000 for finishing flooring and base trim
>> $24,000 for finishing woodworking
>> $139,000 for plumbing
>> $175,000 for electrical work
>
> Gamba had previously told [Ross] the amount of funds available for
> construction and the lump-sum contract was within that amount.

---

[4] At trial, Gamba argued only that Ross and Ticor had breached the indemnity agreement.  Gamba
made no argument about the disbursement agreement.  This is reflected in the trial court's summary of the
parties' claims.  Gamba's App. p. 27.

> Ross met with Gamba and went over the contract and the allowances. On June 2, 2005, Gamba signed the proposal ("contract") and gave Ross the go-ahead on the project.
>
> At the time the contract was signed, Gamba understood that it was a lump-sum contract with allowances; understood what allowances were; and knew what the contract meant. Gamba knew that if he wanted something that was not shown on the existing plans he would have to pay more. Gamba understood that if he changed the final plans and that cost more, Gamba would be responsible.

*Id.* at 29 (formatting altered, citations omitted). The court also declared that "the contract between the parties did not call for the use of change orders" but noted that change orders had been used during construction. *Id.*

The court then turned to the issue of Gamba's liability for the construction-cost overage, rejecting Gamba's argument that Ross had agreed to waive any claim for the overage. The court explained that Ross denied ever waiving its claim, and "[Gamba] himself did not claim there was an oral agreement to waive extras." *Id.* at 31. The court concluded that "there was no oral modification of the contract between [Ross] and Gamba which provided for a waiver of extra costs." *Id.* at 32. The court also rejected Gamba's claim that Ross had acted improperly by not requesting payment for the overage through the draw process, instead waiting until the end of construction to seek payment. The court acknowledged that "in its payment requests, [Ross] consistently listed a contract amount of $2,227,192, adjusted only for the change orders that [Gamba] had signed," however the court noted Ross's testimony to explain why this was done:

> Ross testified that in the construction industry, allowance overages are never included on AIA draw requests. [A banker] testified that it would have been improper for Ross to list additional costs to finish on an AIA form unless there had been an agreement between the parties on the issue.

7

The court accordingly finds that [Ross] did not inappropriately act in presenting its draw requests.

*Id.* at 37-38 (formatting altered, citations omitted). The trial court also rejected Gamba's claim that he was not liable for the overage because he was unaware that the construction budget was being exceeded:

Gamba claimed that he was never advised that he was exceeding allowances and that the first time he became aware of that fact was when he received the February 6, 2006, letter.

The contract did not obligate Ross to provide notice to Gamba that he was exceeding costs.

Moreover, the Court does not find Gamba's denial persuasive. The testimony of others, as well as the construction minutes, [Ross's] letter of November 14, 2005, [Ross's] letter of January 30, 2006, and [Ross's] letter of January 31, 2006, establish otherwise.

The Court finds that [Ross] did not breach the contract with regard to notice, and Gamba knew or should have known increased costs were being incurred.

*Id.* at 36-37 (formatting altered, citations omitted). To the extent that change orders were relevant to Gamba's notice claim, the court again stated that they were not required by the contract, nor were they used in the construction industry to "alert one that they are exceeding contract allowances." *Id.* at 37. However, even if Gamba had not received a change order until after some work was complete, the court explained that "since Gamba approved and accepted all of the work performed by [Ross], the absence of a signed change order addressing the particular work does not preclude [Ross] from billing for same." *Id.*

The court expanded on the issue of Gamba's approval, highlighting the fact that Gamba "was on site daily and did not object to work as it was being constructed" and

8

summarizing Gamba's testimony, in which Gamba "admitted that he did not know of any changes which were made by JMA or [Ross] without his approval." *Id*. at 38. Gamba had also admitted that he was regularly given drawings and sketches at construction meetings, which either he or his wife approved. *Id.* For these reasons, the trial court found that "any changes to the plans were done with Gamba's approval." *Id.* at 38.

The court also rejected Gamba's argument that he was not liable for the overage because "he was not able to understand the blueprints and could not envision what the end product would look like." *Id.* This argument failed because "the evidence establishes that JMA and [Ross] attempted to assist Gamba in understanding the project" with models and visual aids, and Gamba acknowledged this at trial. *Id.*

The court then addressed the remaining claims—first, Gamba's claim that Ross's mechanic's lien constituted slander of title. The court rejected Gamba's slander claim because "at the time [Ross] filed its mechanic's lien, it had a rational basis for filing the lien in the amount that it did." *Id.* at 40. The court similarly rejected Gamba's claim that Ross breached the indemnity agreement by filing a mechanic's lien at the end of the project, saying that "[Ross] did not violate the terms of the [] indemnity agreement so as to give rise to any liability to Gamba." *Id.* at 39.[5]

Ticor's indemnification claim was also rejected by the trial court. The court said that the disbursement and indemnity agreements "acknowledge and contemplate the right of the Contractor to file a mechanic's lien." *Id.* at 40. The court concluded that Ross had not breached the agreements and also found that Ross had not provided any erroneous

_____

[5] The trial court also granted Ticor's motion for judgment on the evidence as to Gamba's breach-of-contract claim against Ticor.

9

information to Ticor. In addition, the court concluded that "the evidence at trial established that the other mechanic's liens which were filed were the result of extra work ordered by Gamba or work excluded from the contract." *Id*.

Having resolved Gamba and Ticor's claims, the trial court concluded:

If the parties enter into a lump[-]sum contract that contains allowances, the owner is responsible for his actions that result in the allowances being exceeded.

The evidence at trial supports the conclusion that [Gamba's] own actions resulted in most of the changes in design and construction. Other testimony and evidence support a conclusion that he was aware the allowances were being exceeded and consequently costs of construction would increase.

The Mechanic's Lien filed by [Ross] included a claim for a markup in costs. [Ross] shall further have and recover against Gamba a 10% markup on the $273,016.69 of additional costs, or the sum of $27,301.67.

*Id.* at 41-42 (formatting altered, citations omitted). The court also awarded Ross additional costs paid to JMA and Circle R on behalf of Gamba in the amount of $59,122.37. *Id.* at 42. Finally, the court granted Ross's request for $63,524.54 in attorney's fees but denied its request for prejudgment interest. *Id.* Although Ross filed its mechanic's lien in the amount of $729,941.89, the trial court ultimately awarded it $295,368.36, for a total of $358,892.90. Gamba and Ticor received nothing on their claims. Gamba and Ticor filed motions to correct error, which the trial court denied.

Ross, Gamba, and Ticor now appeal.

**Discussion and Decision**

Each party to this case challenges certain aspects of the trial court's judgment. Gamba's claims pertain to the court's conclusion that Gamba is liable to Ross for the

10

construction-cost overage. Ross appeals the court's denial of its request for prejudgment interest. Ticor claims that the court erred when it denied its indemnity claim.

The trial court entered findings of fact and conclusions of law. When the trial court enters findings and conclusions, they shall not be set aside unless clearly erroneous. *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1047-48 (Ind. Ct. App. 2009). A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made. *Id.* We review the judgment by determining whether the evidence supports the findings and whether the findings support the judgment. *Id.* We consider only the evidence favorable to the judgment and all reasonable inferences to be drawn from that evidence. *Id.* We neither reweigh the evidence nor assess witness credibility. *Id.*

## I.  Gamba's Claims of Error

### A. *Gamba's liability for the overage*

Gamba argues that there was never a contract to pay any overage detailed in change order 12 or, for that matter, any amount included in Ross's mechanic's lien. Gamba contends that the contract with Ross was a lump-sum contract and therefore any costs beyond the lump-sum amount must have been approved by Gamba in accordance with contract principles. Ross acknowledges that it was a lump-sum contract but argues that the contract included allowances, which Gamba knew could increase. Ross also argues that Gamba understood changing the construction plans could result in additional costs.

11

Gamba does not challenge the trial court's findings on this issue, including its finding that Ross and Gamba discussed the contract terms, including allowances, and that

> At the time the contract was signed, Gamba understood that it was a lump[-]sum contract with allowances; understood what allowances were; and knew what the contract meant. *Gamba knew that if he wanted something that was not shown on the existing plans he would have to pay more[.] Gamba understood that if he changed the final plans and that cost more, Gamba would be responsible.*

Gamba's App. p. 29 (emphasis added, citations omitted). Instead of challenging these findings, Gamba argues that Ross did not obtain Gamba's approval before making changes to the construction plans, which Gamba claims was required by the construction contract and disbursement agreement.[6] To this end, Gamba argues that change order 12 was provided after the changes described in it had been completed and could not serve as a basis for contract modification. These arguments are not persuasive because they fail to refute the trial court's findings that: (1) while the contract was indeed a lump-sum contract, it contained allowances and exclusions, which were subject to price changes; (2) Gamba understood the contract's features and knew that any changes to the construction plans would result in additional costs for which he would be responsible; and (3) the contract did not require the use of change orders. And critically, the trial court found that Gamba approved all of the construction changes. *See id.* at 35, 37-38.

---

[6] This is simply not so. While the Gamba-Ross construction agreement did state that "the allowances for this project will be adjusted as those items are detailed and firm pricing is obtained," Gamba's App. p. 77, this only means that the allowances would be timely adjusted. It does not, as Gamba claims, require that Ross provide Gamba with advance, written notice of construction changes before their execution. And to the extent such advance, written notice was required by the disbursement agreement, this does not change the result in this case. *See infra* p. 15-16.

Because Gamba has not shown these findings to be clearly erroneous, we conclude that the trial court did not err in holding Gamba responsible for the construction-cost overage.

## *B. Equitable relief*

Gamba contends that Ross is not entitled to equitable relief, specifically quantum meruit. However, the trial court's judgment is not based on any equitable theory. Rather, it found that Ross was entitled to relief on its breach-of-contract and mechanic's-lien claims. Gamba has not shown error here.

## *C. Waiver*

Gamba next argues that Ross waived its right to file a lien by executing lien waivers during the draw process set up by Ticor. Ross contends that Gamba has waived this claim. Because Gamba failed to present this specific waiver argument to the trial court, Gamba has waived it.[7] *Jones v. Ind. Bell Tel. Co.*, 864 N.E.2d 1125, 1130 n.4 (Ind. Ct. App. 2007). Even if this claim were not waived, however, it would fail.

Gamba's waiver argument is two-fold. First, Gamba relies on *Kern v. City of Lawrenceburg*, 625 N.E.2d 1326 (Ind. Ct. App. 1993), to argue that Ross cannot recover for the overage because Ross executed lien waivers during construction. But *Kern* is

---

[7] There was a suggestion of waiver at trial, but not on the grounds Gamba now asserts on appeal. Gamba argued that Ross orally agreed to forgo any claim for the overage, and the trial court found that there was no such agreement. *See* Gamba's App. 31-32. Gamba does not argue that this finding is clearly erroneous. Gamba also argued that Ross behaved improperly by not seeking payment for the overage through the draw process, instead waiting until the end of the project. To the extent this argument implies waiver, it too was rejected by the trial court. *See id.* at 37-38 (finding that Ross did not include the overage in a payment request through the draw process because it is not industry practice to do so). Gamba does not argue that this finding is clearly erroneous.

Neither of these arguments, however, puts before the trial court the issue Gamba raises on appeal—that when Ross executed lien waivers for other work it performed, Ross waived its claim to later seek payment for the overage. *See* Gamba's Br. p. 19. Because Gamba did not provide the trial court a opportunity to rule on this issue, it is waived.

13

distinguishable from this case. The lien waivers executed in *Kern* required the contractor to represent and warrant that *"[the contractor] has no other outstanding and unpaid applications, invoices, retentions, holdbacks, chargebacks or unbilled work or materials as of the date of the aforementioned application or invoice"* and provided that:

> [i]n addition, for and in consideration of the amounts and sums received and to be received, the undersigned hereby waives, releases and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of work performed on the above-mentioned project, contract or event transpiring prior to the date hereof, excepting the right to receive payment for work performed and properly completed and retainage, if any, after the date of the above-mentioned application or invoice.

*Id.* at 1330 (emphasis added). Thus, the *Kern* Court found that the lien waivers in that case "*were intended to apply to all extra work* and any and all other claims arising as a consequence of Kern's work on the project as of the date of the waiver." *Id.* (emphasis added). The lien waivers in this case are different. They provide:

> Therefore, the undersigned waives and releases unto the Owner of said premises any and all lien claims whatsoever on the above described property and improvements thereon on account of labor and/or material, furnished by the undersigned thereto, and further certified that no other party has claim or right to a lien on account of any work performed or material furnished to the undersigned for said project, and within the scope of this affidavit and waiver.

*See* Gamba's App. p. 175-203. Both the *Kern* and Ross lien waivers contain "any and all claims" language. But the Ross waivers have no language requiring Ross to represent and warrant that there were no outstanding costs owed to Ross, which bears directly on

14

the issue of extra work. This is a critical difference. Gamba's reliance on *Kern* is misplaced.[8]

Gamba also argues that the terms of the disbursement agreement required Ross to give Gamba advance notice of changes, and by failing to do so, Ross waived its right to assert a claim for the overage.[9] The terms of the disbursement agreement do require advance, written consent before proceeding with any changes. *See id.* at 137. However, the disbursement agreement governs the ability of a signatory contractor to assert a claim for additional expenses as against the loan proceeds being distributed. As Ross correctly notes, it was not intended to supplement or amend the construction contract, and it makes no reference to contractors or owners, speaking only of "lenders" and "escrowees." *Id.* at 134. By contrast, the construction contract between Gamba and Ross governs the conduct of owner and contractor during the project. And that contract did not require change orders or advance, written consent. Gamba cannot rely on language in the disbursement agreement to impose a duty upon Ross that appears nowhere in the Gamba-Ross construction contract, and in turn, argue waiver based upon that duty.[10]

*D. Slander of title*

---

[8] In addition, the construction contract in *Kern* required the use of change orders, which were not required by the contract here.

[9] Gamba made no argument about the disbursement agreement at trial, raising the issue for the first time in its motion to correct error. This is reflected in the trial court's summary of the parties' claims. Gamba's App. p. 27.

[10] Because we conclude that the disbursement agreement did not create any duties other than those required by the Gamba-Ross construction agreement, we reject Gamba's claim that by failing to give advance, written notice of changes, Gamba is entitled to damages from Ross. And to that end, we reiterate the trial court's finding that Gamba was aware of, and approved, all the changes at issue in this case. *See* Gamba's App. p. 35, 37-38.

15

Gamba next contends that the trial court erred in finding that Ross did not commit slander of title. "To succeed on a claim for slander of title, the plaintiff must prove that false statements were made, with malice, and that the plaintiff sustained pecuniary loss as a necessary and proximate result of the slanderous statements." *Holland v. Steele*, 961 N.E.2d 516, 525-26 (Ind. Ct. App. 2012), *trans. denied*. Gamba argues that Ross committed slander of title by filing a mechanic's lien for costs Gamba did not agree to pay and Ross waived the right to claim. Because we have already concluded that Gamba was liable for the overage and Ross did not waive its right to file a lien, the fact that Ross filed a lien cannot support Gamba's slander claim.

Gamba also contends that Ross committed slander by including in the lien amounts it could not recover under statute; specifically general contractor and supervisory fees. Although this claim is waived due to Gamba's failure to raise it at trial, *Indiana Bell Telephone Co*., 864 N.E.2d at 1130, n.4, we address it because we prefer to resolve cases on their merits.

Gamba argues that Ross may only recover for work it performed or materials it provided for the project's use—not work done or materials supplied by any subcontractor. Gamba's Br. p. 25. We addressed a similar argument in *Ford v. Culp Custom Homes*, 731 N.E.2d 468 (Ind. Ct. App. 2000), *trans. denied*. In *Ford*, we explained that a general contractor who was responsible for furnishing labor and materials, as well as scheduling, ordering, and monitoring costs, became "liable to the subcontractors for the cost of the materials and labor" once the materials were delivered

16

to the project, and was entitled to file a mechanic's lien. *Id.* at 474-75 (citations omitted).

We explained that the remedial purpose of Indiana's lien statutes would not be served if

> A general contractor were precluded from asserting a lien that includes work done or material supplied by a subcontractor on a project for which the general contractor is liable under contract to the Homeowner, as well as to the subcontractors he hired in furtherance of the project. This principle was recognized long ago in *Moore Mansfield Construction Co. v. Indianapolis* . . . . [T]he legislature, by expressly naming contractors in the mechanic's lien law, intended that a lien could be asserted, not only by the workmen employed by a contractor, but also by the contractor who employs them.

*Id.* Ross, who accounted for work and materials provided by project subcontractors, was entitled to assert its lien.

*Ford* also resolves Gamba's claim that Ross could not include cost markup, or profit, in its lien. *Ford* provides that including profit in a lien is permissible, "so long as the contractor's work was more than merely supervisory in nature." *Id.* at 475 (citing *Premier Invs. v. Suites of Am., Inc.*, 644 N.E.2d 124, 129-30 (Ind. 1994)). Ross provided more than supervisory services, it also provided physical labor. *See* Gamba's App. p. 115 (list of Ross employees who worked on the project included roofers, carpenters, and general "laborers"). The trial court did not err in concluding that Ross could include profit in its lien.

Finally, to the extent Gamba argues that we should infer malice from the fact that Ross filed a lien for $729,941.89, a significantly larger amount than it ultimately received, we decline to do so. The trial court specifically found that "at the time [Ross] filed its mechanic's lien, it had a rational basis for filing the lien in the amount that it did." *Id.* at 40. Gamba has failed to show that this finding was error.

17

*E. Circle R's lien*

Gamba alleges that Circle R, an electrical subcontractor on the project, also waived its right to file a lien, and therefore Ross cannot recover in Circle R's place, through assignment of Circle R's claim. This argument was not raised at trial or in Gamba's motion to correct errors, and is waived. *Ind. Bell Tel. Co*., 864 N.E.2d at 1130, n.4. Waiver notwithstanding, the argument fails.

Gamba argues that Circle R, like Ross, waived its right to file a lien because it executed lien waivers during construction. Gamba again relies upon *Kern.* But the lien waivers executed by Circle R and Ross are not like those in *Kern*, which the *Kern* Court explained were intended to apply to all extra work. *Kern*, 625 N.E.2d at 1330 (the *Kern* lien waivers expressly required the contractor to represent and warrant that it had "no other outstanding and unpaid applications, invoices, retentions, holdbacks, chargebacks or unbilled work or materials as of the date of the aforementioned application or invoice . . . ."). The lien waivers executed by Circle R provided only that Circle R

> [W]aives and releases . . . any and all lien, right of lien or claim of whatsoever kind of character . . . on the above described building and real estate, to and for said amount, on account of any and all labor, material, or both, furnished for or incorporated into said building by the undersigned, up to this date . . . ."

Gamba's App. p. 214, 216, 218, 220. There was no *Kern*-type language requiring representations or warranties that Circle R had no other outstanding invoices or unbilled work. Circle R did not waive its right to file a lien, and Ross may recover under assignment of that lien.

Gamba also argues that the amount of Circle R's lien was error because it included retention owed by Ross, not Gamba. Ross argues that Gamba has waived this claim by raising it for the first time in its motion to correct errors. *See Shepard Props. Co. v. Int'l Union of Painters and Allied Trades, Dist. Council 91*, 972 N.E.2d 845, 849 n.3 (Ind. 2012) (noting that a party may not raise issues for the first time in a motion to correct error). However, our review of the trial court's judgment indicates that this matter was put before the trial court—the court issued specific findings on the amount of Circle R's lien and whether retention was included in that amount. *See* Gamba's App. p. 36 ("At the time the Circle R lien was filed, the Ross Group owed only retention under its contract."). For that reason, we do not find the issue waived.

The court summarized the amounts owed under the Circle R Lien as follows: $13,209.11 owed by Ross, $20,660.20 owed by Gamba, and $12,626.50 owed by JMA. The trial court ultimately granted Ross a lien in the total amount of these sums: $46,495.87. *Id*. The $13,209.11 figure owed by Ross included retention and approximately $9000 in extra costs. *See* Pl.'s Exh. 14. While the extra costs were Gamba's responsibility, the retention was not. The trial court should not have included whatever amount had been held back in retention by Ross.[11] We remand for a calculation of the exact amount owed in retention at the time Circle R filed its lien and direct the trial court to reduce the judgment for Ross by that amount.

*F. JMA's lien*

---

[11] Pangere testified that the industry practice was to hold back five to ten percent in retention. Tr. p. 114.

Gamba also argues that it is not responsible for extra costs incurred by the project's architects, JMA. Because Gamba did not raise this argument until its motion to correct errors, this argument is waived. *Shepard Props. Co.*, 972 N.E.2d at 849 n.3. Nonetheless, the argument fails.

Gamba essentially argues that Ross was responsible for all architectural fees, no matter what. Gamba relies on the following language from the Ross construction contract: "We are pleased to submit out Lump[-]Sum Proposal to furnish all necessary Design & Engineering, Architectural and MEP Plans . . . ." Gamba's App. p. 71. In the "General Conditions" section, the contract states that Ross will "Provide the [JMA] architectural programming and design work for the project." *Id.* Gamba claims that these provisions entitled it to any and all architectural fees incurred on the project. *See* Gamba's Br. p. 35 ("All architect's fees were implicitly included in the lump sum . . . . All means all . . . .").

The trial court held Gamba responsible for only a portion of the excess architectural fees. The trial court explained that Ross requested $16,151.82 in excess architectural fees "because Gamba took too much time making decisions on the construction details and selections," which "resulted in JMA working beyond its [twelve-month] contract period." Gamba's App. p. 35. The trial court ordered Gamba to pay a portion of the amount Ross requested, $12,626.50. *Id.* at 36.

While the Gamba-Ross construction contract may have contemplated—in lump-sum format—Ross's payment of the architectural fees, the trial court explained that Ross incurred excess fees because of Gamba's delay, which caused JMA to work beyond its

contract period. Gamba fails to show that this finding was error. We cannot say that the trial court abused its discretion in ordering Gamba to pay a portion of the excess architectural fees.

*G. Attorney's fees*

Gamba argues that the trial court erred in awarding attorney's fees to Ross. Indiana Code section 32-28-3-14 provides:

> Sec. 14 (a) Except as provided in subsection (b), in an action to enforce a lien under this chapter, a plaintiff or lienholder who recovers a judgment in any sum is entitled to recover reasonable attorney's fees. The court shall enter the attorney's fees as a part of the judgment.
>
> (b) A plaintiff may not recover attorney's fees as part of the judgment against a property owner in an action in which the contract consideration for the labor, material, or machinery has been paid by the property owner or party for whom the improvement has been constructed.

Because Ross, the lienholder, recovered under the trial court's judgment, Ross was entitled to attorney's fees. The trial court awarded attorney's fees in the amount of $63,524.54.

Gamba's claim of error is based on the arguments above that we have already rejected regarding Ross's right to file a lien. He also claims that subsection (b) of Section 32-28-3-14 prevents an award of attorney's fees to Ross because Gamba had paid Ross in full. However, the trial court found that Ross had not been paid in full; Ross incurred additional expenses beyond the lump-sum noted in the contract due to changes Gamba knew of and approved. Gamba has failed to demonstrate that the attorney's-fee award was error.

21

In a reply-brief footnote, Gamba requests appellate attorney's fees. *See* Gamba's Reply Br. p. 10 n.10 ("Since [trial,] Gamba has been forced to incur further fees and costs in order to prosecute this appeal. Gamba is entitled to judgment against Ross in the total amount of his fees and costs incurred in this case.").

Our appellate rules authorize us to "assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorney's fees." Ind. Appellate Rule 66(E). Damages will be assessed only where an appellant, acting in bad faith, maintains a wholly frivolous appeal. *Harness v. Schmitt*, 924 N.E.2d 162, 168 (Ind. Ct. App. 2010). While Appellate Rule 66(E) allows us to award damages on appeal, we must act with extreme restraint in this regard due to the potential chilling effect on the exercise of the right to appeal. *Id.* "A strong showing is required to justify an award of appellate damages, and the sanction is not imposed to punish mere lack of merit, but something more egregious." *Id.*

To prevail on its claim, Gamba must show that Ross's appellate arguments are "utterly devoid of all plausibility." *Bergerson v. Bergerson*, 895 N.E.2d 705, 716 (Ind. Ct. App. 2008) (citations omitted). Gamba's appellate arguments require the majority of our attention, and on cross-appeal, Ross raises only one argument. That argument is not devoid of all plausibility. Gamba is not entitled to appellate attorney's fees.

## II. Ross's Claim of Error

Ross claims that the trial court erred when it denied Ross's request for prejudgment interest. Because Ross unsuccessfully sought prejudgment interest at trial, it appeals from a negative judgment. When a party appeals from a negative judgment, it

must demonstrate that the trial court's decision is contrary to law; that is, the evidence points unerringly to a conclusion different from that reached by the trial court. *Kummerer v. Marshall*, 971 N.E.2d 198, 201 (Ind. Ct. App. 2012), *reh'g denied*. Prejudgment interest is appropriate in a breach of contract action when "the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Id.* (citation omitted). The award of prejudgment interest is considered proper when the trier of fact does not have to exercise judgment in order to assess the amount of damages. *Id.*

The record indicates that the trial court was required to exercise its judgment in this case. The court had to decide not only which mechanic's liens to include in its judgment, but also what corresponding lien amounts to award to Ross, and both prongs of this decision were contested. This rendered the amount of damages not readily ascertainable. We conclude that the trial court did not abuse its discretion in denying Ross's request for prejudgment interest.

### III. Ticor's Claim of Error

The final issue we must address is Ticor's claim for legal fees. Ticor argues that it is entitled to indemnification from both Ross and Gamba. Ticor bases this claim on the following passages of the disbursement agreement:

> Contractor's Indemnification: Contractor . . . indemnifies and saves Ticor harmless from any and all losses . . . including attorney's fees[,] which Ticor may incur under the aforementioned commitment or policy and the endorsements thereto or under this Escrow agreement, arising from any mechanic's lien and materialmen's liens . . . pursuant to the Contractor's construction contract with Owner or from any erroneous information which Contractor . . . may have provided Ticor Title, or from the breach of any warranty or covenant made by Contractor to Ticor Title.

> Owner's Indemnification: Because Contractor is an agent of Owner for purposes of the construction project, Owner shall be responsible to Ticor Title for the performance of Contractor's obligations in connection with said indemnification.

Gamba's App. p. 139. Therefore, the disbursement agreement requires Ross to indemnify Ticor for legal fees incurred under the agreement and arising out of any of the following: (1) a mechanic's lien pursuant to the Contractor's construction contract with Owner; (2) erroneous information provided by Contractor; or (3) breach of any warranty or covenant made by Contractor to Ticor.

In rejecting Ticor's request for legal fees, the trial court emphasized the fact that Ross did not provide any erroneous information to Ticor or breach the disbursement agreement. *Id.* at 39-40. Ticor does not dispute these findings; it argues that the mechanic's-lien provision applies: "Contractor . . . indemnifies and saves Ticor harmless from any and all losses . . . including attorney's fees[,] which Ticor may incur under the aforementioned commitment or policy and the endorsements thereto or under this Escrow agreement, arising from any mechanic's lien and materialmen's liens . . . pursuant to the Contractor's construction contract with Owner . . . ." *Id.* at 139.

The trial court found that the liens filed in this case were the result of "extra work ordered by Gamba or excluded from the contract," *id.* at 40, and Ross contends that this put the liens "outside the purview" of the disbursement agreement. Ross's Br. p. 29. That is partly true: the contract in this case was a lump-sum contract with allowances, and Gamba exceeded those allowances by making changes to the construction plans. But the trial court found that Gamba approved all the changes and understood that he was

24

increasing construction costs, and consequently found that Gamba was contractually obligated to pay the extra costs. It is therefore incongruent to say that the mechanic's liens, which reflected those extra costs, arose from work excluded from, or unrelated to, the construction contract such that the disbursement agreement does not govern. We hold that Ticor incurred legal fees under the agreement, which arose from Ross's filing of mechanic's liens pursuant to Ross's construction contract with Gamba, and Ticor is entitled to indemnification from Ross.

However, Ross argues that even if we find a duty to indemnify, it cannot be required to pay Ticor's legal fees because Ross is not a signatory to the disbursement agreement. But Ross asserts this representative-capacity argument for the first time on appeal. As a result, it is waived.[12]

Ticor may also recover from Gamba. Gamba does not challenge its liability stemming from Ross's agent status under the agreement, which provides that "*because Contractor is an agent of Owner* for purposes of the construction project, Owner shall be responsible to Ticor Title for the performance of Contractor's obligations in connection with said indemnification."[13] Gamba's App. p. 139 (emphasis added). We reverse the trial court's conclusion that Ross and Gamba are not liable to Ticor under the

---

[12] Had Ross asserted this argument at trial, it may have been successful. Ross explains that only its CEO, Pangere, signed the disbursement agreement, and he did so as an individual. Ross argues that Pangere did not designate his representative capacity by noting his affiliation with Ross or otherwise making any reference to Ross, "so as to bind the Ross Group, Inc." Ross Br. p. 30. Ross also points out that it is not named anywhere in the disbursement agreement. However, Ross failed to put this argument before the trial court, and thus it is waived.

[13] We reject Gamba's argument that Ticor breached the indemnity agreement by acting negligently in disbursing funds. The trial court entered judgment on the evidence in Ticor's favor on this claim, and Gamba fails to show how this was error. And to the extent Gamba argues for Ross's liability under the mechanic's-lien provision instead of its own, we have already concluded that the provision applies.

25

disbursement agreement.  We remand with instructions that the trial court enter an order holding Ross and Gamba jointly and severally liable for Ticor's legal fees.

Affirmed in part, reversed in part, and remanded.

MATHIAS, J., and BARNES, J., concur.